# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Innis Arden Golf Club,             :
    Plaintiff,                :
                              :
v.                                 :    **Case No. 3:06cv1352 (JBA)**
                              :
Pitney Bowes, Inc., et al.,        :
    Defendants.               :

## RULING ON MOTIONS TO DISMISS [DOCS. # 61, 63, 64]

Plaintiff Innis Arden Golf Club ("IAGC"), located in Stamford and Old Greenwich, brings this action against the defendants for allegedly polluting its land with polychlorinated biphenyls ("PCBs"). Defendants Pitney Bowes, Inc. ("Pitney Bowes"), Pateley Associates 1, LLC ("Pateley Associates"), and Metro-North Commuter Railroad Co. ("Metro-North") own and/or control property adjacent to IAGC. Defendants 375 Fairfield Ave. Associates, the Goldblums,[1] the Bronx Bar Supply Co., and Global Development Enterprises LLC, all own and/or control property up-gradient from IAGC. IAGC asserts that Pitney Bowes and Pateley Associates are strictly liable for release of PCBs onto its property in violation of § 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607 (Count One). Pitney Bowes moves to dismiss this claim pursuant to Federal Rule of Civil Procedure 12(b)(1), claiming

---

[1] David, Charles, Michael, Laura, and Maxine Goldblum ("The Goldblums") are named as co-executors for the estate of Murray A. Goldblum. (2d Am. Compl. ¶ 8.)

1

that the plaintiff failed to provide notice to the defendants, the State, and the President of the United States as required under 42 U.S.C. § 9659(d)(1). This failure, Pitney Bowes contends, deprives this court of subject matter jurisdiction which is dependent on proper execution of the procedure prescribed by the statute.

Pitney Bowes, along with defendants 375 Fairfield Avenue Associates, the Goldblums, and Global Development Enterprises, jointly move to dismiss the counts pertaining to negligence _per se_ (Counts Three, Five, Eight, Eleven, and Twenty-One), nuisance (Counts Seven, Ten, Thirteen, and Twenty), and trespass (Count Twenty-Four). The defendants argue that the negligence _per se_ counts are fatally flawed because the statute the plaintiff cites as a basis for the standard of care is inappropriate, and move to have it dismissed pursuant to Rule 12(b)(6). The defendants further challenge for failure to state a claim the nuisance and trespass counts on the grounds that the plaintiff failed to plead all of the elements required for a successful claim.

Defendant Metro-North moves separately to dismiss the counts against it, claiming that as a subsidiary of the Metropolitan Transit Authority (the "MTA"), it is entitled to Eleventh Amendment immunity as an arm of the state of New York. Metro-North also claims that IAGC's claims against it are barred by a New York statute of limitations. Finally, Metro-North contends

that it is exempt from state regulation pursuant to Conn. Gen. Stat. § 16-344, and therefore moves to dismiss the negligence per se claim based on Conn. Gen. Stat. § 22a-427.  Metro-North also joins in the defendants' joint motion to dismiss.

## I.  Factual Background

IAGC is a private, 18-hole, 110-acre golf course.  In October 2004, as a component of a general scheme to improve its grounds, IAGC employed an environmental consulting company to test its property for environmental contaminants.  This testing revealed the presence of PCBs in IAGC's water and soil.  In January 2005, IAGC employed the environmental consulting firm O'Brien & Gere to conduct more extensive testing and develop a remediation plan.  As a result of this testing — and due to the fact that IAGC had never purchased, stored, or used PCBs — the firm concluded that the contamination originated from off-site property owned and used by Pitney Bowes.  Specifically, O'Brien & Gere opined that the contamination appeared to be seeping in through a drainage swale, and the firm notified the state and regional environmental protection authorities of its conclusions. In August 2005, IAGC alerted Metro-North of these findings, and subsequently filed its complaint against the defendants in August 2006.

## II.  Standards

"A case is properly dismissed for lack of subject matter

jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the court may refer to evidence outside the pleadings. Id. Evidence concerning the court's jurisdiction "may be presented by affidavit or otherwise." Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. Makarova, 201 F.3d at 113; see also Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996) (noting that "[t]he burden of proving jurisdiction is on the party asserting it") (quotation marks omitted).

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v.

4

Gibson, 355 U.S. 41, 47 (1957)).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Comm'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 127 S. Ct. at 1965).

## III. Discussion

### A.  CERCLA

Pitney Bowes contends that this Court lacks subject matter jurisdiction over this action because the plaintiff failed to give sixty days notice to the defendants under section 310 of CERCLA, 42 U.S.C. § 9659(d)(1).  Whether this failure in fact deprives the court of jurisdiction hinges on the nature of IAGC's claim and the interaction, if any, between sections 107 and 310 of CERCLA.

In its Second Amended Complaint, IAGC alleges:

16.  The defendant Pateley Associates 1, LLC is the current owner of the property know[n] as 23 and 50 Barry Place.

17.  [T]he defendant Pitney Bowes, Inc. is a past owner and past and past and current operator of 23 and 50 Barry Place.

18.  The plaintiff IAGC's property was contaminated by the hazardous substances released from the facility at 23 and 50 Barry Place.

19.  IAGC has incurred costs in response to the release of hazardous substances at the facility at 23 and 50 Barry Place which are consistent with the National Contingency Plan.

20. Pursuant to 42 U.S.C. § 9607(a), the defendants
are strictly liable for all necessary costs of
response incurred, or to be incurred, by IAGC
consistent with the National Contingency Plan.

(2d Am. Compl. ¶¶ 16-20.)  Turning to the statute, § 107 first

describes four classes of covered persons subject to liability:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any
hazardous substance owned or operated any facility at
which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise
arranged for disposal or treatment, or arranged with a
transporter for transport for disposal or treatment, of
hazardous substances owned or possessed by such person,
by any other party or entity, at any facility or
incineration vessel owned or operated by another party
or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous
substances for transport to disposal or treatment
facilities, incineration vessels or sites selected by
such person, from which there is a release, or a
threatened release which causes the incurrence of
response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a)(1)-(4).  These persons are then made liable

for:

(A) all costs of removal or remedial action incurred by
the United States Government or a State or an Indian
tribe not inconsistent with the national contingency
plan;

(B) any other necessary costs of response incurred by
any other person consistent with the national
contingency plan;

(C) damages for injury to, destruction of, or loss of
natural resources, including the reasonable costs of
assessing such injury, destruction, or loss resulting
from such a release; and

> (D) the costs of any health assessment or health effects study carried out under section 9604(I) of this title.

§ 9607(a)(4)(A)-(D).  The Second Circuit has described § 107 as "establish[ing] four classes of responsible parties liable for the costs of responding to releases or threatened releases of hazardous substances."  B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992).

Pitney Bowes argues for dismissal based on the citizen suit provision of CERCLA, § 310.  Under that section,

> any person may commence a civil action on his own behalf . . . against any person (including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter . . . .

42 U.S.C. § 9659(a)(1).  But a person may not commence such an action "before 60 days after the plaintiff has given notice of the violation," specifically to "[t]he President," "[t]he State in which the alleged violation occurs," and "[a]ny alleged violator."  § 9659(d)(1)(A)-(C).  According to Pitney Bowes, any private suit brought under CERCLA, including a § 107 action for recovery costs, must comply with the notice requirements of § 310(d)(1).  Because IAGC gave no such notice, Pitney Bowes contends that this is a jurisdictional flaw which justifies dismissal.  See Roe v. Wert, 706 F. Supp. 788, 789 (W.D. Okla. 1989) (barring plaintiffs' § 107 claim for lack of notice under

7

§ 310); Denison v. Kitzhaber, 2001 U.S. Dist. LEXIS 12514 at *15-
*17 (D. Ore. July 22, 2001) (dismissing suit brought pursuant to
section 310 due to lack of notice); W. Dallas Coalition for
Envtl. Justice v. United States, 1998 U.S. Dist. LEXIS 19844 at
*6 (N.D. Tex. Dec. 14, 1998) (dismissing citizen suit for lack of
notice); Fried v. Sungard Recovery Servs., Inc., 900 F. Supp.
758, 766-67 (E.D. Pa. 1995) (finding notice on federal government
inadequate and dismissing plaintiffs' CERCLA citizen suit); cf.
Hallstrom v. Tillamook County, 493 U.S. 20, 33 (1989) (dismissing
action brought under analogous citizen suit provision of RCRA for
failure to meet the statutory notice requirement).

Thus, the issue is which of two competing interpretations of
CERCLA is correct: either § 107 defines liabilities and remedies
which are privately enforceable only according to the terms of
§ 310; or the two sections provide two distinct remedial
possibilities for private parties, one to recover response costs,
and the other to induce legal compliance.  In Key Tronic Corp. v.
United States, the Supreme Court noted the distinction between
sections 107 and 310 in the context of a discussion about
attorney's fees:

> As we have said, neither § 107 nor § 113 expressly
> calls for the recovery of attorney's fees by the
> prevailing party. In contrast, two SARA provisions
> contain explicit authority for the award of attorney's
> fees.  A new provision authorizing private citizens to
> bring suit to enforce the statute, see 100 Stat.
> 1704-1705, expressly authorizes the award of
> "reasonable attorney and expert witness fees" to the

> prevailing party.  42 U.S.C. § 9659(f).

511 U.S. 809, 817 (1994).  Continuing, Justice Stevens wrote for

the majority that "§ 107 unquestionably provides a cause of

action for private parties to seek recovery of cleanup costs,

[although] that cause of action is not explicitly set out in the

text of the statute."  Id.  In a partial dissent, Justice Scalia

was even more explicit:

> Section 107(a)(4)(B) states, as clearly as can be, that
> "[c]overed persons . . . shall be liable for . . .
> necessary costs of response incurred by any other
> person."  Surely to say that A shall be liable to B is
> the express creation of a right of action.  Moreover,
> other language in § 107 of CERCLA refers to "amounts
> recoverable in an action under this section," 42 U.S.C.
> § 9607(a)(4)(D), and language in § 113 discusses the
> "civil action . . . under section 9607(a) [i.e.,
> § 107(a) of CERCLA]," 42 U.S.C. § 9613(f)(1).

Id. at 822 (Scalia, J., dissenting in part) (emphasis and

alterations in original, but footnote omitted); see also id. at

822 n.* ("Section 107(a)(4)(B) states that persons are liable for

certain costs "incurred by any other person" . . . thus providing

an express cause of action for private parties.")

Other cases have discussed the relationship if any between

§ 107 and § 301 more directly.  For example, according to the

court in Regan v. Cherry Corp.,

> § 310 does not provide a private right of action for
> response costs as does § 107.  The purpose of § 310
> . . . is not to reimburse citizens for out-of-pocket
> expenses, but to prod government agencies into
> vigorously enforcing CERCLA and to allow private
> actions to compel compliance when the EPA and state
> still fail to act.  While § 107 concerns liability and

compensation for pollution, § 310 is aimed at coercing
governmental enforcement of hazardous waste laws.

706 F. Supp. 145, 148 (D.R.I. 1989). In City of Detroit v. A.W.
Miller, Inc., the plaintiff, like IAGC, brought a private-party
action under § 107 "seek[ing] contribution for environmental
cleanup costs" from defendants. 842 F. Supp. 957, 959-60 (E.D.
Mich. 1994). The court squarely rejected the contention that
failure to comply with the § 310 notice provision also barred a
suit brought under § 107:

> [Defendant] claims that plaintiff's claim is barred
> because plaintiff failed to give defendant notice that
> it was "in violation of any standard, regulation,
> condition, requirement or order," as required by 42
> U.S.C. § 9659. Plaintiff's complaint is not alleging
> that [defendant] presently is in violation of any
> environmental standard, regulation, condition,
> requirement or order. Rather, plaintiff is seeking
> contribution for clean-up costs under 42 U.S.C. §
> 9613(f). Subsection (d) of section 9659 makes clear
> that the notice provisions [defendant] argues are
> applicable here, apply only to actions brought under
> subsection 9659(a).

Id. at 964. This interpretation of CERCLA is further supported
by other cases in which courts have explained the prerequisites
for recovery of response costs by private parties under § 107
without reference to § 310 or any notice requirement. See, e.g.,
Murtha, 958 F.2d at 1198 (defining the four elements of a prima
facie case under § 107); Gen. Elec. Co. v. Litton Indus.
Automation Sys., Inc., 920 F.2d 1415, 1417-20 (8th Cir. 1990)
("[Section 107(a)] holds the party responsible for a hazardous
substance release liable for cleanup costs incurred as a result

of the release [and] allows a private party who incurs such costs to recoup its cleanup expenses from the responsible party."); 3550 Stevens Creek Assocs. v. Barclays Bank of California, 915 F.2d 1355, 1358 (9th Cir. 1990) ("There is no question that section 107(a)(2)(B) expressly creates a private cause of action.") (quotation marks omitted); cf. Walls v. Waste Resource Corp., 823 F.2d 977, 981 (6th Cir. 1987) ("hold[ing] that the sixty-day notice provision of § 9612(a) does not apply to private actions for the recovery of response costs" brought pursuant to § 107(a)).

Although much of the authority cited by Pitney Bowes simply reaffirms the view that non-compliance with the notice prerequisite renders a claim under § 310 barred, Roe v. Wert does support the interpretation of CERCLA that even a claim under § 107 must follow the procedures in § 310. 706 F. Supp. at 792. In that case, landowners brought suit pursuant to § 107 "for response costs and environmental damage arising from an alleged hazardous waste disposal" adjacent to their property. Id. at 789. The court's conclusion that lack of notice barred plaintiffs' claims was based on the view that "[s]ection 9607 provides for claims against Superfund, [while] section 9659 is for citizens suits brought by private parties against all other entities." Id. at 792. However, this is inconsistent with the plain language of § 107, which provides that the covered persons

are liable for removal costs incurred by the federal government, a state, an Indian tribe, or "any other person."  42 U.S.C. § 9607(a)(4)(A)-(B).

Here, IAGC only claims remediation costs under § 107, alleging defendants are strictly liable for improper disposal of hazardous waste on its property.  With no reference to § 310 or any "violation of any standard, regulation, condition, requirement, or order," IAGC's allegations show that it is seeking only the type of recovery available pursuant to § 107. The Court concludes that there is no notice-and-waiting prerequisite to plaintiff's CERCLA claim.  Thus the Court has subject matter jurisdiction, and defendant's motion to dismiss the CERCLA claim is denied.

### B.    Negligence <u>Per</u> <u>Se</u>

Defendants move to dismiss plaintiff's counts Three, Five, Eight, Eleven, and Twenty-One, alleging negligence <u>per</u> <u>se</u> based on violation of Conn. Gen. Stat. §22a-427, part of the state Water Pollution Control Act ("WPCA").  Defendants claim that plaintiff's reliance on this statute as the basis for these claims must fail as the WPCA was not intended as a basis for negligence <u>per</u> <u>se</u> actions.  The statute reads, "[n]o person or municipality shall cause pollution of any of the waters of the state or maintain a discharge of any treated or untreated wastes in violation of any provision of this chapter."  § 22a-427.

While Connecticut trial courts have reached mixed results to date, this Court has previously reached the conclusion "that the legislature did not intend to provide private parties with negligence per se actions for violation of [the WPCA]." Bernbach v. Timex Corp., 989 F. Supp. 403, 408 (D. Conn. 1996). Supporting this view was the Connecticut Supreme Court's reasoning that the act is intended as a broad enforcement tool to be used by the Commissioner of Environmental Protection. Starr v. Comm'r of Envtl. Prot., 226 Conn. 358, 382 (1993). The court relied on an extensive recounting of the legislative history of the WPCA in finding that "the legislature [] mandate[d] that the [Commissioner] be given broad powers under the act to issue orders necessary to correct existing and potential sources of pollution and to achieve the remedial purposes of the act." Id.; accord Connecticut Water Co. v. Town of Thomaston, 1996 Conn. Super. LEXIS 596, at *4 (March 4, 1996) (finding it clear from the case law and legislative history that the WPCA was intended as a broad administrative regulation and not a narrow proscription on which the plaintiff may rely to establish a standard of care); but see Goodrich v. Jennings, 1997 WL 197733 at *1 (Conn. Super. May 22, 1997) (not addressing legislative intent); Walker v. Barret, 1999 WL 1063189, at *3 (Conn. Super. Nov. 8, 1999) (applying two-part test to a claim of negligence per se under WPCA); French Putnam LLC v. County Environmental

<u>Services Inc</u>., 2000 WL 1172341, at *9 (Conn. Super. July 21, 2000) (denying motion to strike subsequent to a finding that the claim satisfied two-prong test).

Given the purpose of the WPCA as a broad administrative measure, combined with the requirement that negligence <u>per se</u> actions be based on a clear statutory standard of behavior aimed at individuals, this Court again concludes that the broad proscription contained in § 22a-427 may not be used by individuals as a standard for negligence <u>per se</u> actions, and that therefore defendants' motion to dismiss Counts Three, Five, Eight, Eleven, and Twenty-One is granted.[2]

## C. Nuisance

Defendants jointly move for dismissal of plaintiff's nuisance claims for failure to state a claim on which relief can be granted by reason of its failure to specify either absolute or negligent nuisance. Plaintiff's complaint alleges, in language repeated throughout, that the

> contamination of IAGC's property has resulted in an unreasonable interference with the use of its property. . . . The emanation of PCBs from the property of the defendants in this count constitutes the maintenance of a nuisance by said defendants causing IAGC to expend large sums merely to be able to use its property for its intended use.

---

[2] This conclusion renders moot defendant Metro-North's alternative argument that the negligence <u>per</u> <u>se</u> asserted against it should be dismissed on the ground that Metro-North is exempt from regulation by the state of Connecticut. <u>See</u> Conn. Gen. Stat. § 16-344.

(2d Am. Compl. ¶¶ 23-24, 46-47, 60-61, 74-75, 79-80, 92-93, 105-106).  Under Connecticut law, a nuisance claim requires proof on four elements: "(1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages."  Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33, 35-36 (1978).  In case of an absolute nuisance, a plaintiff must also prove "(1) that the condition or conduct complained of interfered with a right common to the general public" and "(2) that the alleged nuisance was absolute, that is, that the defendants' intentional conduct, rather than their negligence, caused the condition deemed to be a nuisance."  Conn. v. Tippetts-Abbett-McCarthy-Stratton, 204 Conn. 177, 183 (1987).  This distinction between categories of nuisance is not perfectly clear, however, and neither is the precise meaning of the term "nuisance" itself.  See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 86, at 616 (5th ed. 1984) ("There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.'")

Under Rule 8(a)(2), IAGC's obligation is only to submit "a short and plain statement of the claim showing that [it] is entitled to relief"; "[t]his simplified notice pleading standard

relies on liberal discovery rules and summary judgment motions to define disputed facts and issues." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002). The allegations in IAGC's complaint are sufficient to put the defendants on fair notice of the claim and its general grounds, see Twombly, 127 S. Ct. at 1964, and therefore dismissal of these counts is inappropriate.

### D. Trespass

Defendants challenge IAGC's allegation that they had notice of the contamination of IAGC's property as insufficient to satisfy the intent requirement of an action for trespass such that Count Twenty-Four should be dismissed. The Second Amended Complaint alleges:

> 120. The migration of PCBs onto the property of IAGC from the property owned and controlled or controlled by one or more of the defendants is continuing in nature and continues to cause IAGC damage.

> 121. Despite having been informed of the PCB contamination of IAGC's property, the defendants, individually and collectively, have intentionally refrained from taking appropriate steps to contain the migration or otherwise acting to protect plaintiff from injury and to restore its property.

(2d Am. Compl. ¶¶ 120-21.) In Connecticut, the elements of a trespass action are: "(1) ownership or possessory interest in land by the plaintiff; (2) invasion, intrusion, or entry by the defendant affecting the plaintiff's exclusive property interest; (3) done intentionally; and (4) causing direct injury." Abington Ltd. P'ship v. Talcott Mountain Sci. Ctr. for Student

16

<u>Involvement, Inc.</u>, 657 A.2d 732 (Conn. Super. Ct. 1994) (<u>citing</u>
<u>Avery v. Spicer</u>, 90 Conn. 576, 579 (1916)); <u>see</u> 1 Dan B. Dobbs,
<u>The Law of Torts</u> § 13, at 100-01 (2001) ("The defendant intends
an entry if it is his purpose to enter [or] if he knows that his
actions make entry substantially or virtually certain to
follow.").

Defendants argue that IAGC "has failed to allege that the
Defendants were informed or otherwise knew their own property was
contaminated (and, by implication, knew their property may be the
source of the contamination affecting the plaintiff's property,"
and that "any failure to abate contamination on the plaintiff's
property cannot amount to intentional conduct sufficient to give
rise to a trespass action." (Defs.' Mem. at 11-12.) The Court
does not find IAGC's allegations to be so flawed at this stage in
the litigation. Owing once again to the plaintiff's minimal
pleading obligations under the federal rules, the complaint
states a valid claim for trespass, and the motion to dismiss
Count Twenty-Four is denied.

### E.  Sovereign Immunity

Metro-North contends that, as a subsidiary of the MTA, it is
entitled to sovereign immunity under the Eleventh Amendment.
Metro-North "is entitled to immunity if it can demonstrate that
it is more like an "arm of the state," such as a state agency,
than like "a municipal corporation or other political

subdivision." Mancuso v. N.Y. State Thruway Auth., 86 F.3d 289,

292 (2d Cir. 1996) (quoting Mt. Healthy City Sch. Dist. Bd. of

Educ. v. Doyle, 429 U.S. 274, 280 (1977)).  In Mancuso, the

Second Circuit described six factors that should be considered

when evaluating whether a particular entity is an arm of the

state and thus immune:

> (1) how the entity is referred to in the documents that
> created it; (2) how the governing members of the entity
> are appointed; (3) how the entity is funded; (4)
> whether the entity's function is traditionally one of
> local or state government; (5) whether the state has a
> veto power over the entity's actions; and (6) whether
> the entity's obligations are binding upon the state.

86 F.3d at 293; see also Feeney v. Port Auth. Trans-Hudson Corp.,

873 F.2d 628, 630-31 (2d Cir. 1989), aff'd on other grounds, 495

U.S. 299 (1990).  As a jurisdictional ground for dismissal under

Rule 12(b)(1), evidence outside the pleadings may be considered

in making this assessment, but the burden falls to the defendant

to prove that it enjoys sovereign immunity.

As to the first factor (how the entity is designated in its

founding documents) the evidence is inconclusive.  The MTA was

incorporated as a "public benefit corporation" by the New York

legislature, and is considered a state agency under New York law.

N.Y. Pub. Auth. L. §§ 1263(1), (5).  But state law elsewhere

"provides that the MTA is independent and not within the

supervisory authority of the New York State Department of

Transportation."  A. Esteban & Co. v. Metro. Transp. Auth., 2004

18

WL 439505, at *5 (S.D.N.Y. Mar. 9, 2004); § 1266(8). The second
factor, (how the governing members of the entity are appointed)
weighs strongly in favor of immunity: the Governor of New York
appoints all members of the MTA's Board of Directors, with the
consent of the state senate, and may remove them for cause.
§§ 1263(1), (7).

Third, the question of entity funding should be examined on
the basis of the subsidies Metro-North receives from New York;
because it seeks immunity as an arm of that state, any subsidies
received from Connecticut are irrelevant. The evidence
accompanying Metro-North's brief indicates that as of 2006 the
MTA relied on state and local funding for 37% of its revenue, but
this budget summary also shows that Metro-North receives 9% of
the total MTA budget. There is insufficient evidence in the
record to draw any meaningful conclusions about the nature of
Metro-North's state funding.

The fourth factor (whether the entity's function is
traditionally one of the state) is neutral. The Mancuso court
suggested that providing transportation for citizens is
traditionally a state function, 86 F.3d at 295, as compared with
the conclusion in Esteban that the MTA's function is "essentially
regional rather than statewide," 2004 WL 439505, at *5. The
fifth factor as to the state's veto power is also neutral. The
Esteban court made a distinction between operational control and

19

financial control, deeming the latter less indicative of veto power, and found that the state "has no direct oversight over the Authority's actions." Id. Defendant contends that MTA "represent[s]" New York in overseeing the Metro-North budget, but this type of oversight does not provide evidence of veto power by the state itself.

Finally, the sixth factor asks whether the state is exposed to financial risk in the event that the entity is held liable for damages, which is arguably the most important factor. The evidence submitted by Metro-North describes the relationship between litigation expenses and the net operating deficit. But on this limited record, there is insufficient support for Metro-North's contentions that it "cannot finance its own litigations" and that "any judgments rendered against [it] will primarily fall on the shoulders of taxpayers." (Metro-North Mem. at 16.) Absent a more direct tie to the New York treasury, this factor is inconclusive.

More generally, there is no basis on which to conclude that the dignity of the state of New York is impugned by a suit against Metro-North, and balancing of the Mancuso factors is no more definitive. In sum, on the present record, Metro-North has not shown that it is an arm of the state and thus immune under the Eleventh Amendment.

**F.    Statute of limitations — choice of law**

Metro-North also contends that the plaintiff's claim is time barred by New York Public Authorities Law § 1276(b), which limits the time in which a tort claim against the MTA may be filed to one year.  Metro-North reads Federal Rule of Civil Procedure 17 (b), which states that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized," as requiring New York law to be applied.  However, choice of law principles determine whether the New York or Connecticut time bar applies to this action.

Federal courts apply the choice of law rules of the forum state.  Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151 (2d Cir. 2003).  In Connecticut, a tort claim is determined by the law of the place where the injury took place, unless this produces an arbitrary, irrational result, in which case Restatement (Second) Conflict of Laws § 145 controls.  Williams v. State Farm Mut. Auto. Ins. Co., 229 Conn. 359, 370 (1994); O'Connor v. O'Connor, 201 Conn. 632, 650 (1986).  Metro-North does not disagree that the claimed injury occurred in Connecticut.

The applicable Connecticut statute imposes a two-year limitation period.  Conn. Gen. Stat. § 52-584.  Neither party disputes that IAGC discovered the PCB contamination in October 2004 and that the complaint was filed in August 2006.  Therefore,

IAGC's claim against Metro-North is timely, and its motion to dismiss on this ground is denied.

## VII. Conclusion

Accordingly, defendants' Motions to Dismiss are granted in part and denied in part. The motions are GRANTED as to Counts Three, Five, Eight, Eleven, and Twenty-One, relating to negligence _per_ _se_. As to all other counts in IAGC's Second Amended Complaint, the motions are DENIED.


IT IS SO ORDERED.



/s/_____

JANET BOND ARTERTON, U.S.D.J.


**Dated at New Haven, Connecticut, this 27th day of September, 2007.**