UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Innis Arden Golf Club,<br>    *Plaintiff,*<br><br>         *v.*<br><br>Pitney Bowes, Inc., et al.,<br>    *Defendants.* | Civil No. 3:06cv1352 (JBA)<br><br><br><br>May 21, 2009 |

**RULING ON MOTIONS FOR SANCTIONS
FOR SPOLIATION OF EVIDENCE**

In this case brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Connecticut state law, Plaintiff Innis Arden Golf Club ("Innis Arden") seeks to recover the costs it incurred and is incurring in removing polychlorinated biphenyls ("PCBs") from its property, along with other compensatory, injunctive, and equitable relief. Pitney Bowes, Inc. ("Pitney Bowes"), one of the two remaining defendants, has moved for this Court to impose sanctions on Innis Arden for spoliation of evidence. Specifically, Pitney Bowes charges Innis Arden with failing to preserve soil samples and the electronic data packages associated with the testing of those samples, and requests dismissal or an alternative sanction based on the severe prejudice caused by this spoliation. The other remaining defendant, Pateley Associates 1, LLC ("Pateley"), joins Pitney Bowes and seeks sanctions on the same grounds. After full consideration of the parties' written submissions, and after hearing oral argument, the Court grants Pitney Bowes's and Pateley's motions and imposes the sanction set out below.

**I.     Relevant Background**

The facts relevant to the disposition of these motions are as follows. Innis Arden is a century-old golf club located in Old Greenwich, Connecticut. It first discovered PCBs on

its property in October 2004. (D'Andrea Dep., Ex. A to Pitney Bowes's Mot. Sanctions [Doc. # 419], at 91:13–17.[1]) In January 2005, Innis Arden hired the environmental-consulting firm O'Brien & Gere ("OBG"). The engagement letter dated January 3, 2005 summarized OBG's proposals for proceeding with remediation on Innis Arden's contaminated property. (OBG Letter, Jan. 3, 2005, Ex. B.) This letter, in a paragraph captioned "Cost Recovery," demonstrates that Innis Arden contemplated the possibility of seeking recovery of its remediation costs from the responsible parties and that OBG would tailor its sampling program to that end:

> Since IAGC is the innocent landowner in this case, the opportunity for seeking cost recovery for the remedial program may be appropriate. As the program moves forward, we will conduct work in anticipation of this course without incurring additional costs. Once IAGC makes a decision, [OBG] will provide whatever assistance is required to pursue cost recovery.

(*Id.* at 3.)

From 1967 to February 2009, Pitney Bowes occupied a property adjacent to Innis Arden and located on Barry Place.[2] OBG identified the Barry Place property as a potential source of the PCBs later in January 2005. In an e-mail message dated January 20, 2005, OBG vice president Steven Roland noted: "The source appears to be from Pitney Bowes but if cost recovery is to be pursued, additional samples should be taken to build a more convincing case." (Roland E-mail, Jan. 20, 2005, Ex. C at 1.) Roland elaborated on this in a letter he sent to Innis Arden a week later, explaining that additional sampling would be necessary "to

---

[1] Unless otherwise noted, all record references are to exhibits attached to Pitney Bowes's motion for sanctions.

[2] In other pleadings pending before the Court, Pitney Bowes disputes its status as a potentially responsible party ("PRP") under CERCLA, but this issue will not be resolved here.

identify the potential source of the PCBs" and that a "strategy for seeking cost recovery" would begin with "a technical presentation scheduled with the suspected responsible party," followed by "legal recourse" if necessary. (OBG Letter, Jan. 28, 2005, Ex. D, at 1.) Innis Arden approved and authorized this strategy on February 1, 2005. (*Id.* at 4.) At least by March 2005, Innis Arden had retained counsel to advise on the cost-recovery efforts described by OBG. In a letter sent to Innis Arden on March 23, 2005, Roland noted that "additional tasks proposed to continue potential cost recovery activities include . . . [assembling] a project file of relevant documents collected or prepared to-date to provide to Chris McCorm[a]ck of Tyler Cooper [and meeting] with Chris to review the details of the project documents." (OBG Letter, Mar. 23, 2005, Ex. F, at 4.)

By July 2005, Innis Arden was actively laying the groundwork for a cost-recovery action against Pitney Bowes and other PRPs. On July 7, McCormack, who was then Innis Arden's counsel, e-mailed his client and several others (including Roland) outlining the strategy for going after other property owners but also raising potential problems with the sample testing. (McCormack E-mail, July 7, 2005, at 1.) McCormack raised "the possibility of additional testing that will provide an idea of the age of the PCB deposits in pond sediment"—specifically, based on the presence of radioisotopes generated by atmospheric nuclear testing which ceased in the mid-1960s. (*Id.*) McCormack also expressed concern about the relative concentrations of PCBs on the Innis Arden and Pitney Bowes properties:

> We still do not seem to have information that accounts for the high concentrations found on the Innis Arden property. The positive results on the Pitney Bowes property are at much lower levels and there does not seem to be a mechanism for PCBs at those levels to concentrate into much higher levels by themselves. Some positives in the catch basins are also at low levels and involve different kinds of PCBs, but regular maintenance may have cleaned out sediment that would have been more revealing. I don't want to

3

> say these results are "inconclusive," because I think they provide an excellent connection with the Pitney Bowes property. They just do not go as far as we would ideally like them to go.

(*Id.*) In this message, McCormack further emphasized "the advisability of giving the 'PRPs' at least some notice in order to minimize the potential for them to say later that we destroyed the evidence, etc." (*Id.* at 2.)

Innis Arden then identified the record owners of the nearby properties for the purpose of assigning potential responsibility for the PCB contamination. Through counsel, Innis Arden wrote to Whisper Capital, LLC—thought to be the owner of the Pitney Bowes site on Barry Place—on August 10, 2005. (McCormack Letter, Aug. 10, 2005, Ex. Q at 1.) This letter referenced testing done on samples taken from Pitney Bowes property and asserted that "releases of PCB-containing material appear[] to have contributed . . . to PCB contamination on Innis Arden's property." (*Id.*) Counsel offered "to share the data" from the analysis of samples taken from Barry Place, and advised that remediation of the Innis Arden property was to begin within two weeks. (*Id.* at 2.) The letter, however, makes no reference to any sampling or analysis of PCB material taken from Innis Arden's property. Over the next month, Innis Arden heard back from several PRPs, and in e-mail correspondence counsel further cautioned about the impact of remediation on evidence relevant to the case:

> We obviously wanted to give the potentially responsible parties an opportunity to request access to the Club's property before remediation alters existing conditions. Having given the notice and received no such request, we should be in good shape to limit any claim of prejudice.

(McCormack E-mail, Sept. 2, 2005, Ex. T, at 1.)

In the Quality Assurance Project Plan developed by August 2005, OBG set out the

standard operating procedures that were to govern storage and disposal of samples in the Innis Arden project:

> 4.9.1 . . . When analysis is completed and the results reported to the client, the samples are stored for one additional month. If samples are to be placed on hold, archived or contain hazardous wastes, the Project Supervisor forwards a completed Waste Disposal/Sample Archiving Facilitation Form . . . to instruct Sample Receiving on how to store or dispose of the samples.
>
> 4.9.2 After one month of storage, or at the time designated by the Project Supervisor, the sample is removed from the cooler for return to the client or ultimate disposal, based on the information on the Waste Disposal/Sample Archiving Facilitation Form. Disposal practices follow the SOP for handling hazardous wastes.

(App. B to Quality Assurance Project Plan, Ex. H, at 7.) Internal OBG e-mails show that, by June 2005, Innis Arden and OBG were in the process of "deactivat[ing]"—OBG's euphemism for "disposal"—samples unless specifically placed on hold. On June 7, 2005, John Bracken wrote to Monika Santucci (both OBG employees) "regarding the Innis-Arden sample deactivation," asking whether the timing of sample extraction "affects their hold times," and requesting to "put [certain] samples on hold." (Bracken E-mail, June 7, 2005, Ex. L, at 1.) In another e-mail three days later, Bracken cited certain samples and confirmed that "their hold times are now extended for about a month, correct?" (*Id.* at 2.) According to a handwritten note on that same document, two of the samples mentioned were later to be taken off hold. (*Id.*)

Roland elaborated on these issues in his deposition.[3] In one extended exchange,

---

[3] At the outset, Innis Arden's counsel and Roland himself confirmed that he, having been noticed "as a 30(b)(6) representative of IAGC," was "testifying on behalf of IAGC." (Roland Dep., Ex. 2 to Pitney Bowes's Mot. Summ. J., at 10:13–12:7.)

Roland testified about the circumstances under which the samples OBG took were disposed of without notice:

> Q. Now, when you take samples, what is your protocol? How do you do it? . . .
>
> A. The sediment samples would be obtained by a clean stainless steel trial, . . . placed in the laboratory supply jar, identified, sealed and then sent to the laboratory. . . .
>
> Q. And then once the sample was sent to the lab, and, I assume, tested—
>
> A. Yes.
>
> Q. —what happened?
>
> A. The laboratory forwarded the results to us.
>
> Q. Okay. And then what happened to the sample? . . .
>
> A. The sample, according to laboratory protocol, is to dispose of the samples.
>
> Q. So in this case and in all of the samples you have taken, have you retained any samples?
>
> A. No. . . .
>
> Q. So if any defendant wanted to test any of the material that you took from the remediation site, they could not do that today.
>
> A. That's correct.
>
> Q. Because the remediation materials were taken to a dump and disposed of, correct?
>
> A. To a landfill, yes.
>
> Q. You knew this case was going to be in litigation, correct? . . .
>
> A. We anticipated that this possibly could go to litigation.
>
> Q. Okay. Did anyone tell you to retain the samples as evidence for this

>
> case?
>
> A. No.
>
> Q. Did you ask?
>
> A. No. . . . But we discussed with counsel notification requirements of all those responsible parties in advance of the remediation to allow them the opportunity to participate or obtain whatever samples they were wanting.
>
> Q. Well, I'm asking you about the evidence you gathered as evidence of alleged contamination. Did you retain that evidence?
>
> A. No. Standard—standard protocol is to dispose of samples once analyzed. . . .
>
> Q. Do you know when the samples in this case were destroyed?
>
> A. No.
>
> Q. Prior to destroying any or all of the samples, did you give notice or did counsel give notice to any of the defendants in this case?
>
> Mr. Flynn:    Objection
>
> A. I don't know.
>
> Mr. Steinberg: Did you?
>
> Mr. Flynn:    Did I give notice?
>
> Mr. Steinberg: You or your company.
>
> Mr. Flynn:    Notice of what?
>
> Mr. Steinberg: That they were going to destroy the samples. I think it's pretty obvious what the question is.
>
> Mr. Flynn:    Did we give notice? No.

(Roland Dep., Ex. E, at 34:2–41:7.) This non-retention practice governed OBG's disposal of both the initial samples taken in early 2005 and the additional samples taken later during

7

remediation and even after the commencement of litigation. (*Id.* at 67:23–71:4.) Roland also confirmed that, other than analyzing soil samples for PCBs, OBG did not trace the migration of the metals and organic compounds to Innis Arden's property, nor did OBG take samples from other nearby properties other than Pitney Bowes's. (*Id.* at 111:9–112:7, 222:17–223:5.) Roland further corroborated McCormack's previously raised concern about dating the sediment samples, but confirmed that OBG never conducted date-testing on the PCBs and pond sedimentation. (*Id.* at 179:4–81:18.) Neither Innis Arden's counsel nor OBG ever instituted a "litigation hold" on OBG's internal documents or soil samples relating to the Innis Arden project, and so all e-mail messages and draft documents and reports were deleted after thirty days. (*Id.* at 346:19–348:23.)

More recently, during discovery in this case, Innis Arden's counsel contracted with SGD Environmental Services ("SGD") requesting that "a Level 3 data package be prepared, to the extent possible, from electronically archived [PCB] data generated for sediment/soil samples collected from [Innis Arden]." (SGD report, Ex. Z, at 1.) According to the executive summary prepared by SGD in February 2009, much of the original electronically stored data from the PCB analyses was not preserved.[4] SGD noted that "[n]o hardcopies of original laboratory data were available or provided," that "electronic raw [gas chromatograph] data for some samples were not backed-up," and that "only the sample results were originally reported, without quality control sample data, calibration data, raw instrument data or analyst/technician logs, etc." (*Id.*)

---

[4] The manner in which Innis Arden preserved and belatedly disclosed many thousands of other documents in this case is itself the subject of a separate sanctions motion pending before Magistrate Judge Margolis, whose involvement with the parties' many discovery issues in this litigation has been substantial and invaluable.

II. **Discussion**

The duty to preserve relevant evidence is fundamental to federal litigation. In *Fujitsu Ltd. v. Federal Express Corp.*, the Second Circuit described this duty, and the consequences associated with breaching it, as follows:

> The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence. *See id.* at 127. The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, *see West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999), and is assessed on a case-by-case basis. *See United States v. Grammatikos*, 633 F.2d 1013, 1019–20 (2d Cir. 1980).

247 F.3d 423, 436 (2d Cir. 2001). In addition to the sanctions authorized by Federal Rule of Civil Procedure 37(b) for spoliation of evidence in violation of a court order, "a district court may impose sanctions for spoliation, exercising its inherent power to control litigation." *West*, 167 F.3d at 779.

Here, there is no dispute that the soil samples taken from Innis Arden's property were not preserved. Thus, the Court must consider: (1) whether Innis Arden was obligated to preserve the samples and associated data for litigation and failed to do so; and (2) whether this failure to preserve evidence warrants imposition of sanctions, and, if so, of what severity.

A. **Duty to Preserve the Sampling Evidence**

The "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation." *Kronisch*, 150 F.3d at 126. This duty may attach not only once legal proceedings have begun, but also "when a party should have known that the

evidence may be relevant to *future* litigation." *Id.* (emphasis added). As other courts have found, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003); *see also Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118 (S.D.N.Y. 2008) (following *Zubulake*'s formulation); *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 377 (D. Conn. 2007) (same); *In re NTL, Inc. Securities Litig.*, 244 F.R.D. 179, 193 (S.D.N.Y. 2007) (same).

Pitney Bowes contends that Innis Arden's duty to preserve the samples in this case arose no later than early 2005. Innis Arden argues that the Court should "be careful" in assessing a spoliation claim in the context of a CERCLA case (Pl.'s Opp'n [Doc. # 464] at 15), but the case it cites in favor of applying a different spoliation standard, *New York v. Moulds Holding Corp.*, 196 F. Supp. 2d 210, 214 (N.D.N.Y. 2002), merely provides an overview of the purposes underlying CERCLA.[5] Other courts have had no difficulty applying the recognized

---

[5] While Innis Arden references cases which summarize the general spoliation standard, its opposition memorandum contains no legal authority supporting application of a different standard in a CERCLA case. (*See* Pl.'s Opp'n at 15–18.) Innis Arden also offers the following policy argument about preservation of evidence in CERCLA actions: "Courts cannot expect, and Congress certainly did not intend, that parties engaging in environmental cleanup preserve every sample they take, and delay remediation until they are certain that any potentially responsible party has been notified before they commence cleanup." (Pl.'s Opp'n at 18.) However, Pitney Bowes's spoliation motion is about the destruction of the samples (and associated data), not the remediation, and preservation of samples is unrelated to the scheduling of remediation. Holding Innis Arden responsible for failing to preserve evidence in no way suggests that parties need delay remediation—only that where remediation will eliminate potential future sampling, the investigation, remediation, and cost-recovery phases must proceed in accordance with the usual rules governing preservation of potentially relevant evidence for litigation.

spoliation analysis in the context of CERCLA claims.  *See, e.g., Weyerhaeuser Co. v. Petro-Hunt L.L.C.*, No. 04-2177, 2008 WL 4425466, at *2–*3 (W.D. La. Sept. 30, 2008) (holding that "the circumstances of Petro-Hunt's remediation of conditions on the [subject] property constituted a deliberate spoliation of relevant evidence" and finding that an adverse inference is an appropriate sanction); *AmeriPride Servs., Inc. v. Valley Indus. Serv., Inc.*, No. 00-113, 2006 WL 2308442, at *9–*10 (E.D. Cal. 2006) (concluding, in an action for removal costs under CERCLA, that "drawing an adverse inference against AmeriPride is an appropriate sanction" for its failure to preserve evidence from the contaminated property).

      The undisputed evidence shows that Innis Arden recognized the relevance of the samples to anticipated litigation.  The engagement letter between Innis Arden and OBG indicated as much, and Roland confirmed the details of the plan for cost recovery and potential legal action in later letters in January and March 2005.  The fact that Innis Arden was working to identify the parties responsible for the PCB contamination and then to pursue recovery of costs establishes that litigation was reasonably anticipated from the very beginning of the investigation and remediation process.  In correspondence with Innis Arden, OBG repeatedly described how analysis of the samples would provide the critical basis on which to hold other parties responsible for the PCBs found on Innis Arden's property, and the sampling results now provide a predicate factual basis for Innis Arden's expert witnesses' opinions as to causation.

      Thus, according to Innis Arden's own documents, Innis Arden knew that OBG's investigation sampling was a critical part of possible cost-recovery litigation, and the duty to preserve this evidence attached at the latest by mid-2005, by which time counsel was actively involved in the investigation and analysis of the samples in preparation for legal

action against Pitney Bowes and other parties. Nonetheless, as Roland confirmed in his deposition, all the samples were destroyed shortly after the completion of PCB analysis, and the electronic records of the PCB analyses similarly were not preserved.

Innis Arden argues that OBG's "deactivation" of all soil samples and related data and documents did not amount to spoliation of evidence for essentially two reasons. First, Innis Arden claims that it discharged its duty to preserve by giving notice to Pitney Bowes. The record does not support such a contention. In the letter sent to Whisper Capital (targeting the Barry Place property) in August 2005, McCormack (on behalf of Innis Arden) wrote only that Innis Arden's engineers had taken samples from *Pitney Bowes's* property. McCormack asserted that analysis of these samples shows that PCB releases from Barry Place caused Innis Arden's contamination, but McCormack said nothing about the sampling program on *Innis Arden's* property, nor did he advise that such samples collected would be destroyed (or already had been destroyed, such that pre-remediation re-sampling could be considered). During colloquy at oral argument, Innis Arden did not point to any evidence that Pitney Bowes or any other PRP was put on notice that samples or the electronic data associated with them would not be preserved. Rather, the undisputed evidence shows that Innis Arden gave notice only regarding the remediation of its property, and Roland's deposition confirmed that OBG's laboratory personnel disposed of the samples as a matter of course—beginning at least by June 2005 and continuing even after the case was filed in August 2006—with no notice to any defending party.

Second, Innis Arden contends that its failure to preserve this evidence should be excused because Pitney Bowes has not demonstrated that it intended to actually use or rely on the evidence during litigation, and that Pitney Bowes's motion is motivated by litigation

opportunism. This, too, is unavailing. According to its own documents, Innis Arden recognized from the beginning that the analysis of soil samples was the key evidence in this case. Correspondence between Innis Arden and OBG in early 2005 confirms that the sampling would provide the basis for the anticipated cost-recovery efforts against neighboring property owners, and McCormack emphasized the importance of the sampling in his July 2005 e-mail. McCormack also raised the possibility of doing further testing and analysis to rule out other PRPs, in particular the ability to look for radioisotopes in the sediment that could establish that the PCBs predated Pitney Bowes's occupancy of Barry Place. In internal documents, Innis Arden's expert Swiatoslav Kaczmar—who was involved in the sample analysis as early as July 2005 (*see* Pernick E-mail, July 14, 2005, Ex. P)—elaborated on other kinds of tests that would help pin down a time frame for the PCB contamination. Correspondence between OBG and Innis Arden also includes discussion of different ways that the PCB-contaminated samples can be analyzed for the purpose of correlating the chemical "fingerprint" of the PCBs found on Innis Arden's property with those on Barry Place. In his deposition, Roland testified that OBG did not pursue these areas of inquiry, which is precisely why Pitney Bowes argues that the destruction of the evidence is so significant. Because Innis Arden's consultants and experts rely on the sampling but did not utilize the full range of analyses on the soil samples, and because the samples and complete data packages no longer exist, Pitney Bowes cannot effectively challenge Innis Arden's experts or defend itself using all available scientific methods. In short, Innis Arden not only did not perform all the tests that it believed to be relevant before the samples were destroyed, it precluded Pitney Bowes from running potentially exculpatory tests by failing to preserve this material.

Innis Arden maintains that "[t]he duty to preserve evidence . . . is not indefinite"—which, as a general matter, is correct. But the cases in which courts deny requests for sanctions turn on facts showing that the party seeking the evidence either disclaimed an interest in the evidence or did not seek to inspect the evidence within a reasonable time. *See, e.g.*, *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457–58 (2d Cir. 2007) (declining to impose sanctions where the party "affirmatively disclaimed any interest in the evidence . . . after being provided a full opportunity to inspect the items"); *Fujitsu*, 247 F.3d at 436 (finding sanctions not warranted given that "FedEx did not request to inspect the damaged shipping container after Fujitsu notified it of the damage, nor at any time other than prior to making the summary judgment motion"). Here, Pitney Bowes's inaction in responding to Innis Arden's offer to share data about Pitney Bowes's own property, or in failing to do its own sampling on Innis Arden's property in the brief pre-remediation time frame, does not constitute disclaimer of an interest in the sampling evidence which Innis Arden possessed and would soon destroy.

Furthermore, Innis Arden bears responsibility for this failure to preserve evidence given the close ties between Innis Arden and OBG. Courts have found that an expert's destruction of evidence can be attributed to its client, the party, and Innis Arden does not contest this point. In *State Farm Fire & Casualty Co. v. Frigidaire*, for example, the court sanctioned the plaintiff with dismissal after its expert directed the destruction of a defective dishwasher in a products-liability action, holding that "an expert should not be permitted intentionally or negligently to destroy such evidence and then substitute his or her own description of it." 146 F.R.D. 160, 163 (N.D. Ill. 1992); *see also Thiele v. Oddy's Auto & Marine, Inc.*, 906 F. Supp. 158, 162 (W.D.N.Y. 1995) (quoting *Frigidaire* with approval).

14

Therefore, the Court concludes that the undisputed evidence shows that Innis Arden breached its duty to preserve its sampling evidence and associated data. Consequently, no evidentiary hearing on Pitney Bowes's state of mind and failure to act, as requested by Innis Arden, is necessary. Given this conclusion, the next question is what sanction, if any, should follow.

### B.     Appropriate Sanctions

After a finding of spoliation, "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779. Factors to be considered include "the degree of fault of the party who altered or destroyed the evidence," "the degree of prejudice suffered by the opposing party," and whether the appropriate sanction minimizes the prejudice to the opposing party and "serve[s] to deter such conduct by others in the future." *Howell v. Maytag*, 168 F.R.D. 502, 505 (M.D. Pa. 1996) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)).

In the Second Circuit, a party may be sanctioned for the destruction of evidence even in the absence of bad faith or intentional misconduct. *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107–08 (2d Cir. 2001). "Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case." *Reilly v. Natwest Markets Group*, 181 F.3d 253, 267 (2d Cir. 1999). Here, the record demonstrates that Innis Arden, as confirmed by correspondence with its counsel and OBG, wished to pursue a cost-recovery action against Pitney Bowes from the outset. In the e-mail message McCormack circulated in July 2005, he outlined the importance of the sediment-sample evidence and also

15

emphasized the need for Innis Arden to avoid being accused of destroying evidence. Yet, OBG never conducted the additional testing or sampling that it recognized was available, and the evidence which would have been used for such testing was disposed of with no notice to Pitney Bowes or anyone else, followed by site-altering remediation precluding later replication.

Unlike other cases involving difficulties of evidence preservation—for example, the scene of a fire in a house, *Howell*, 168 F.R.D. at 506—there is no reason offered why it was not feasible, either logistically or economically, for OBG to store the soil samples in its laboratory. Contrary to Innis Arden's contention, federal regulations permit rather than prohibit such storage. *See* 40 C.F.R. § 261.4(d)(vi) (authorizing temporary storage of a hazardous sample in a laboratory for "a specific purpose," including "until conclusion of a court case or enforcement action where further testing of the sample may be necessary"). Moreover, such retention is consistent with the procedures for sample storage that OBG developed. Innis Arden's culpability is based on OBG's continuous and on-going sample "deactivation," and on its counsel's failure to issue any evidence-preservation directive despite contemporaneously recognizing the potential negative consequences of evidence destruction. Under these circumstances, Innis Arden's failure to preserve evidence warrants sanctions.

Pitney Bowes also claims that it is significantly prejudiced by the loss of the sample evidence because it now cannot analyze the soil samples for dating analysis and cannot assess the precise types of PCBs, as well as other compounds, in the sampling from Innis Arden's property. This prejudice is consistent with Innis Arden's recognition of the relevance of such additional testing—which it never performed—in its correspondence with OBG. In his

July 2005 e-mail, McCormack suggested doing the same types of further testing as a way of making the link between Pitney Bowes and Innis Arden more conclusive. Because the sediment samples and data no longer exist and cannot be re-tested, date-tested, or subjected to more refined testing, Pitney Bowes cannot conduct the analysis on which it might have developed evidence that the PCBs on Innis Arden's property were not caused by a post-1967 release from Pitney Bowes.

Even if this course of conduct may not warrant outright dismissal, a severe sanction nevertheless is necessary, because overlooking the failure to preserve this evidence would have the effect of condoning this broad disregard for the need to retain raw scientific-sampling evidence and might not deter similar conduct in future CERCLA actions. *See Kronisch*, 150 F.3d at 126 (noting that imposing sanctions for spoliation serves "evidentiary, prophylactic, punitive, and remedial rationales"). Where a defending party's task "has been rendered more difficult by the failure to have an opportunity to inspect" critical evidence, a "spoliation inference" is warranted. *Baliotis v. McNeil*, 870 F. Supp. 1285, 1292 (M.D. Pa. 1994). But based on Innis Arden's lack of any evidence-preservation efforts, its inoperative "notice" to other parties regarding the status of the evidence, and the significant prejudice suffered by Pitney Bowes, the sanction of a negative inference in Pitney Bowes's favor does not suffice. Apart from the somewhat awkward way that an adverse inference would be applied in this bench trial, merely sanctioning Innis Arden with an adverse inference does not adequately serve the prophylactic and preventative purposes of the spoliation doctrine in these circumstances.

While the Court finds no basis on which to conclude that Innis Arden purposefully destroyed evidence to advantage it or disadvantage Pitney Bowes, the consequences of the

loss of this evidence are significant and cannot be adequately remedied through applying an adverse inference. By virtue of the failure to preserve scientific sampling and data, Pitney Bowes has been precluded from what might have been a bright-line defense, such as radioisotope dating showing that the PCB-contaminated sediment predated Pitney Bowes's presence on Barry Place. Such a defense could obviate the need for and expense of a trial, while a negative-inference sanction can only be applied *at* trial. In destroying the underlying evidence that its experts have relied on, Innis Arden has hampered Pitney Bowes's capacity to challenge the underlying foundations for the experts' opinions. In short, the key raw "fingerprint" evidence in this case simply no longer exists, but the party that is responsible for its destruction seeks to benefit from its use. For all these reasons, in the Court's view, the appropriate sanction to adequately address the harm suffered by Pitney Bowes, penalize Innis Arden, and deter future destruction of evidence is preclusion of evidence based on the soil samples Innis Arden took from its own property and subsequently destroyed.

### III.   Conclusion

Accordingly, Pitney Bowes's and Pateley's motions for sanctions for spoliation of evidence [Doc. ## 419, 426] are granted, and the sanction of preclusion detailed above will be imposed at trial and in consideration of the pending motions for summary judgment and *Daubert* expert exclusion.

                IT IS SO ORDERED.

                /s/
                Janet Bond Arterton, U.S.D.J.

        Dated at New Haven, Connecticut this 21th day of May, 2009.