UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------------x
                                          :
INNIS ARDEN GOLF CLUB                     :
                                          :          3:06 CV 1352 (JBA)
v.                                        :
                                          :
PITNEY BOWES, INC. ET AL.                 :          DATE: MAY 21, 2010
                                          :
--------------------------------------------------------x

<u>RULING ON DEFENDANT PITNEY BOWES' AND ON DEFENDANT PATELEY'S
APPLICATIONS FOR ATTORNEYS' FEES AND COSTS</u>

The factual and procedural history of this litigation[1] is set forth in considerable detail

in the numerous published, and unpublished, decisions filed in this lawsuit, familiarity with

which is presumed.  <u>See, e.g., Innis Arden Golf Club v. Pitney Bowes, Inc.,</u> 514 F. Supp. 2d

328 (D. Conn. 2007)(Arterton, J.)(dismissing Counts Three, Five, Eight, Eleven and Twenty-

one, relating to negligence <u>per se</u> under CONN. GEN. STAT. § 22a-427, while permitting all other

counts, arising under CERCLA, nuisance and trespass, to continue)[2]; <u>Innis Arden Golf Club v.</u>

<u>Pitney Bowes, Inc.,</u> 257 F.R.D. 334 (D. Conn. 2009)(Arterton, J.)(granting defendants'

motions for sanctions for spoliation of evidence)["Spoliation Ruling"]; <u>Innis Arden Golf Club</u>

<u>v. Pitney Bowes, Inc.,</u> 629 F. Supp. 2d 175 (D. Conn. 2009)(Arterton, J.)["Summary

Judgment/<u>Daubert</u> Ruling"](granting defendants' motions to preclude plaintiff's experts from

testifying at trial and granting defendants' motions for summary judgment on the CERCLA and

state law claims); Ruling on Defendant Pitney Bowes, Inc.'s Motion for Sanctions Against

---

[1]Plaintiff's Second Amended Complaint, filed November 13, 2006 (Dkt. #57) asserted twenty-four counts against the numerous defendants.

[2]<u>See also Innis Arden Golf Club v. Pitney Bowes, Inc.,</u> 541 F. Supp. 2d 480 (D. Conn. 2008)(granting defendants' motion to strike jury claim as to CERCLA, nuisance and trespass claims).

Plaintiff Innis Arden for Discovery Abuse, filed May 27, 2009 (Dkt. #515)["May 2009 Sanctions Ruling"], <u>approved over objection</u>, 629 F. Supp. at 191-92 ("[G]iven Magistrate Judge Margolis's close familiarity with the issues in this litigation, the Court finds that imposing monetary sanctions in the form of attorney's fees and costs was an entirely appropriate exercise of discretion.")(footnote omitted).[3] <u>See also</u> Dkts. ## 191, 202, 208, 230, 251, 314-16, 385-86, 388-93, 400.

In accordance with deadlines set by this Magistrate Judge in the May 2009 Sanctions Ruling (at 14; <u>see also</u> Dkts. ##534, 536-37, 539-40), on August 4, 2009, defendant Pitney Bowes, Inc. ["Pitney Bowes"] filed its Application for Attorneys' Fees and Costs (Dkt. #541)[4]; that same day and the next day, defendant Pateley Associates 1, LLC ["Pateley"] filed its Application for Attorneys' Fees and Costs (Dkts. ##542-43).[5] On September 11, 2009, Pateley

---

[3]On July 28, 2009, Innis Arden filed its Notice of Appeal.  (Dkt. #538).

[4]The following twenty-five exhibits are attached to the Joint Affidavit of Attorneys Marty Steinberg and Richard Colbert, sworn to August 4, 2009 ["Jt. Aff't"]: letter from Attorney Marty Steinberg to Pitney Bowes, dated October 1, 2008 (Exh. A); letter from Attorney Richard P. Colbert to Pitney Bowes, dated December 8, 2008 (Exh. B); time sheets of Hunton and Williams, from October 1, 2008 through July 30, 2009 (Exh. C); time sheets of Day Pitney, LLP (Exh. D); affidavit of Attorney Mark P. Schnapp, sworn to July 31, 2009 (Exh. E); affidavit of Attorney Craig A. Raabe, sworn to August 3, 2009 (Exh. F); biography of Attorney Steinberg (Exh. G); biography of Brent A. Fewell (Exh. H): biography of Rafael F. Ribeiro (Exh. I); biography of Melissa L. Bilchik (Exh. J); biography of Jamie Zysk Isani (Exh. K); biography of Hilary L. Brickey (Exh. L); Hunton & Williams LLP Disbursement Summary under May 27, 2009 Ruling (Exh. M); affidavit of Attorney Peter M. Nolin, sworn to July 31, 2009 (Exh. N); biography of Richard P. Colbert (Exh. O); copy of Malan & Jones, <u>Charging Ahead</u>, Conn. L. Trib. (Jan. 7, 2008)(Exh. P); biography of Sarah F. DePanfilis (Exh. Q); Day Pitney LLP Disbursements Summary under May 27, 2009 Ruling (Exh. R); biography and time sheets of Guy Wm. Vaillancourt, P.E. (Exh. S); biography and time sheets of Alfred Gravel (Exh. T); and biography and time sheets of Robert J. Hubbard, P.E. (Exh. U).

Also attached to the motion is the affidavit of Attorney Diane W. Whitney, sworn to July 27, 2008 ["Whitney Aff't"], with time sheets from January 7, 2008 to September 18, 2008.

[5]Attached to Dkt. #542 is an affidavit of Attorney Sarah P. Kowalczyk, sworn to August 4, 2009, to which was attached time sheets from January 14, 2009 to August 4, 2009 (Exh. A).

Attached to Dkt. #543 is the Revised Affidavit of Attorney Kowalczyk, sworn to August 5, 2009 ["Kowalczyk Aff't"] with the same Exh. A and invoices for transcripts (Exh. B).

filed a Supplement to its Revised Application. (Dkt. #546).  On November 2-3, 2009, plaintiff filed its brief in opposition and exhibits. (Dkt. #557-59[6]; see also Dkts. ##544-45, 547-56). On December 31, 2009, plaintiff filed its amended brief in opposition. (Dkt. #568).  On January 8, 2010, defendant Pitney Bowes filed its reply brief (Dkt. #569)[7]; three days later, defendant Pateley filed its reply brief (Dkt. #570[8]; see also Dkts. ##560-67).

For the reasons stated below, defendant Pitney Bowes' Application for Attorneys' Fees and Costs (Dkt. #541) is granted in the amount of $456,754.86 in attorney's fees, $26,648.91 in expert fees, and $32,940.90 in costs, for a total of $489,695.76, and defendant Pateley's Application for Attorneys' Fees and Costs (Dkt. #542) is granted in the amount of $30,529.62 in attorney's fees and $2,570.00 in costs, for a total of $33,100.12.

## I. DISCUSSION

In its comprehensive Application for Attorney's Fees and Costs, filed August 4, 2009 (Dkt. #541), defendant Pitney Bowes sought a total of $748,532.65 in attorney's fees and

---

[6]Dkt. #558 consists of the following twenty-five exhibits: affidavit of Attorney Jeffrey J. Tinley, sworn to October 22, 2009 (Exh. 1); affidavit of Attorney Robert B. Flynn, sworn to November 2, 2009 (Exh. 2); chart with hourly rates of defense counsel (Exh. 3); summaries of objections to defendants' time sheets (Exhs. 4-13, 23); copy of web pages of Murtha, Cullina for Attorneys Francis J. Brady, Sarah P. Kowalczyk, Loni S. Gardner, Diane W. Whitney (Exh. 14); maps and reports (Exh. 15); excerpts from transcript of telephonic status conference before Judge Arterton on May 15, 2009 (Exh. 16); e-mail from Attorney Christopher McCormack to Steve Roland, dated July 7, 2005 (Exh. 17); excerpts of deposition transcript of Swiatoslav Kaczmar, taken on February 26, 2009 (Exh. 18); Statement of Joseph J. Pignatello, dated January 3, 2008 (Exh.19); Report of Swiatoslav Kaczmar, with time sheets (Exh. 20); copy of case law (Exh. 21); e-mail from Attorney Diane W. Whitney to Guy Vaillancourt, dated July 25, 2008 (Exh. 22); Request for Chromatograms (Exh. 24); and e-mail from Jesse Edmands to Vaillancourt, dated February 1, 2008, with whiteboard notes attached (Exh. 25).

[7]The following exhibits are attached: Affidavit of Vicki A. O'Meara, Executive Vice President and Chief Legal and Compliance Officer for Pitney Bowes, sworn to January 5, 2010 (Exh. 1); copy of letter from Hunton Williams to O'Meara, dated October 1, 2008 (Exh. A); Supplemental Affidavit of Craig A. Raabe, sworn to January 7, 2010 (Exh. 2); Affidavit of Stanley A. Twardy, Jr., sworn to January 5, 2010 (Exh. 3); Affidavit of Georgina Soto, sworn to January 7, 2010 (Exh. 4); copies of billing entries (Exhs. A-C); and copies of case law (Exh. 5).

[8]Attached is the affidavit of Hugh F. Murray, sworn to January 11, 2010.

costs.   (Dkt. #541, at 1).  Defendant Pitney Bowes, which undoubtedly was the "target defendant" in this litigation, originally was defended by Pullman & Comley, LLC ["P&C"], during which time the "case moved along at a modest and leisurely pace"; in October-November 2008, several attorneys from Hunton & Williams, LLP ["H&W"] and Day Pitney LLP ["DP"] filed their appearances, due to a conflict in the previous representation.  (Dkt. #541, Jt. Aff't, at 2).  Thereafter, the case truly proceeded at "warp speed," in order to complete discovery, file dispositive motions, and commence trial, then scheduled for May 1, 2009.  (Dkt. #541, Jt. Aff't,  at 2-7; see also Dkt. #267).[9]  The breakdown for these costs is as follows in Table 1:

**Table 1**

| Law Firm | Attorney's Fees | Costs | Subtotal |
|----------|----------------:|------:|---------:|
| Pullman & Comley | $35,637.50 | $0.00 | $35,637.50 |
| Hunton & Williams | $479,731.60 | $13,999.40 | $493,731.00 |
| Day Pitney | $169,799.00 | $22,716.24 | $192,515.24 |
| PB's Expert Costs | $26,648.91 | $0.00 | $26,648.91 |
| TOTALS | $711,817.01 | $36,715.64 | $748,532.65 |

(Dkt. #541, Jt. Aff't, at 7-13 & Exhs. C-D, M, R).

Three attorneys from P&C were involved in this litigation, from January 7, 2008 through September 18, 2008, as follows in Table 2:

---

[9]The commencement of trial was postponed briefly, to May 26, then to June 1, and last to June 29, 2009.  (Dkts. ##366, 508, 514).

**Table 2**

| Attorney | Hours | Hourly Rate | Subtotal |
|---|---:|---:|---:|
| Diane W. Whitney | 76.0 | $350 | $26,600.00 |
| Megan M. Youngling | 15.9 | $175 | $2,782.50 |
| Kurt Sheathelm | 41.7 | $150 | $6,255.00 |
| TOTALS | 133.6 | | $35,637.50 |

(Dkt. #541, Jt. Aff't, at 5-6, 15 & nn.10-11, & Exh. 2).

Six attorneys and two paralegal assistants from H&W were involved in this

litigation, from October 2008 through July 2009, as follows in Table 3:

**Table 3**

| Attorneys | Hours – 11/08 to 2/28/09 | Hourly Fee – 11/08 to 2/28/09 | Hours –3/1/09 to Present | Hourly Fee - 3/1/09 to Present | Subtotal |
|---|---|---|---|---|---|
| Marty Steinberg | 108.8 | $580 | 171.8 | $647 | $174,258.60 |
| Brent Fewell | 30.2 | $405 | 1.5 | $463 | $12,925.50 |
| Rafael Ribeiro | 49.1 | $215 | 113.0 | $342 | $49,202.50 |
| Melissa Bilchik | 70.0 | $195 | 285.1 | $230 | $79,223.00 |
| Jamie Zysk Isani | 52.7 | $300 | 136.9 | $405 | $71,254.50 |
| Hillary Brickey | 1.0 | $195 | 0.5 | $322 | $356.00 |
| Beth Moon | 157.50 | $170 | 240.0 | $200 | $74,775.00 |
| Gloria Donaire* | 0.0 | $125 | 104.2 | $125 | $13,025.00 |
| Other Attorneys** | 10.9 | | 0.0 | | $4,711.50 |
| TOTALS | 491.2 | | 1,056.0 | | $479,731.60 |

* = Donaire had no time prior to March 1, 2009.
** = This figure combines the times of Attorneys Hernandez, Julin and Yagerman, without regard to the time period.

(Dkt. #541, Jt. Aff't, at 7-11, 15 & Exhs. C, G-L).

Three attorneys and two paralegal assistants from DP were involved in this litigation, from January 2009 through July 2009, as follows in Table 4:

**Table 4**

| Attorney | Hours | Hourly Rate | Subtotal |
|---|---|---|---|
| Richard Colbert | 63.3 | $450 | $28,485.00 |
| Sarah DePanfilis | 362.6 | $315 | $114,219.00 |
| Jonathan Shapiro | 13.9 | $370 | $5,143.00 |
| Arlene Zelesnick | 114.5 | $160 | $18,320.00 |
| Tiffany Beverley | 22.7 | $160 | $3,632.00 |
| TOTALS | 577.0 | | $169,799.00 |

(Dkt. #541, Jt. Aff't, at 11-13, 15 & Exhs. D, O, Q).

The expert fees for which Pitney Bowes is seeking reimbursement are as follows in Table 5:

**Table 5**

| Name | Expert Fees |
|---|---|
| Guy Vaillancourt | $16,303.49 |
| A.J. Gravel | $7,836.11 |
| Robert J. Hubbard, P.E. | $2,509.31 |
| TOTAL | $26,648.91 |

(Dkt. #541, Jt. Aff't, at 13-15 & Exhs. S-U).

In its Applications for Attorneys' Fees and Costs, filed on August 4-5, 2009 (Dkts. #542-43; see also Dkt. #546), Pateley seeks $35,971.00 in attorney's fees and $2,570.50 in costs, for a total of $38,541.50.   (Dkt. #543, at 1, Kowalczyk Aff't, ¶¶ 7-13, Exhs. A-B). Five attorneys and two paralegal assistants from Murtha Cullina LLP ["MC"] were involved in this file, from January 14, 2009 through August 4, 2009.  (Kowalczyk Aff't. ¶ 10 & Exh. A).

Not surprisingly, Innis Arden has raised a multitude of objections to these two fee applications, emphasizing that it "does not . . . question the Court's decision to award fees

7

and costs" in that its "discovery compliance was inadequate over an extended period," but in evaluating Pitney Bowes' fee application, Innis Arden requests that the Court " assess the level of effort reasonably necessary to defendant against [p]laintiff's claims, given the discovery misconduct found by the Court." (Dkt. #568, Brief, at 1-2; <u>see also</u> Dkt. #557). First, Innis Arden objected to the hourly rates charged by defense counsel, arguing that: (a) the rates charged by H&W's most senior counsel ought to be reduced to that charged by MC's most senior counsel, namely $525/hour; (b) H&W should be not awarded its nearly across-the-board rate increases after March 1, 2009; (c) the rates charged by DP ought to be reduced to those charged  by MC's attorneys of "comparable experience"; and (d) the hourly rates of the paralegal assistants ought to be reduced to a range of $100 to $150.  (Dkt. #568, Brief, at 14-19 & Exhs. 3, 14).  Second, Innis Arden objected to certain categories of fees and costs as being outside the May 2009 Sanctions Ruling.  (<u>Id.</u>, Brief, at 19-35 & Exhs. 4-13, 23). Third, Innis Arden argued that Pateley is not entitled to any attorney's fees, given Pitney Bowes alone filed the Motion for Sanctions, which was granted in the May 2009 Sanctions Ruling.  (<u>Id.</u>, Brief, at 35-36).  Last, counsel for Innis Arden implored that there be no increase in the fee award for deterrence purposes as the "severe reprimand" of the Court has been "more than adequate to deter future similar conduct."  (<u>Id.</u>, Brief, at 36-38).   Under this analysis, the attorneys' fees and costs to be awarded to Pitney Bowes would be reduced by $551,324.15 to $207,200.20. (<u>Id.</u>, Brief, at 1, 39).

In its reply brief, Pitney Bowes responded that its hourly rates are reasonable and comparable to in-district rates (Dkt. #569, at 1-4; <u>see also</u> Dkt. #570), and that  the fees and expenses sought were within the bounds of the May 2009 Sanctions Ruling (Dkt. #569, at 4-10).

A.  HOURLY RATES OF PITNEY BOWES' ATTORNEYS

As previously noted, Innis Arden objected to the hourly rates charged by defense counsel, arguing that: (a) the rates charged by H&W's most senior counsel ought to be reduced to that charged by MC's most senior counsel, namely $525/hour; (b) H&W should be not awarded its nearly across-the-board rate increases after March 1, 2009; (c) the rates charged by DP ought to be reduced to those charged by MC's attorneys of "comparable experience"; and (d) the hourly rates of the paralegal assistants ought to be reduced to a range of $100 to $150.  (Dkt. #568, Brief, at 14-19 & Exhs. 3, 14).

As Innis Arden correctly has observed, between the two fee applications, defendants have submitted "five separate sets of rates, each claimed for defending against the same claims, all in effect within six months of each other."  (Dkt. #568, Brief, at 15 (footnote omitted); see also Dkt. #558, Exh. 3).   After P&C withdrew its appearances for Pitney Bowes and Pateley in November 2008 as a result of a conflict, Pitney Bowes retained H&W, while Pateley retained MC; Innis Arden concedes that "[a]t first, [H&W's] initial rates were comparable to [MC's], with the exception of lead counsel's rate, which was $55 higher," and that "[t]hese rates are comparable to the prevailing rates paid by clients for commercial litigation in Connecticut courts."  (Dkt. #568, Brief, at 16 (footnote omitted); see also Dkt. #558, Exh. 1, ¶¶ 13-16).

1.  HIGHER FLORIDA RATES OF H&W

In 2007, the Second Circuit addressed the "forum rule" extensively, with respect to attorney's fees applications seeking out-of-district, and higher, hourly rates.   Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 493 F.3d 110 (2d Cir. 2007), amended on other grounds, 522 F.3d 182 (2d Cir. 2008).  In Arbor Hill, regarding an election, plaintiffs had been represented by attorneys located in the Southern District of New York,

whose fees were substantially higher than those charged in the Northern District of New York, where the action had been litigated.  As Circuit Judge Walker explained: "According to the forum rule, courts should generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." 493 F.3d at 119 (internal quotations & citations omitted).  The Second Circuit continued, however, that a court may apply an out-of-district rate if, "in calculating the presumptively reasonable fee[,]  . . . it is clear that a reasonable, paying client would have paid those higher rates." Id.  The Second Circuit held:

> [w]e presume  . . . a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally. This presumption may be rebutted--albeit only in the unusual case--if the party wishing the district court to use a higher rate demonstrates that his or her retention of an out-of-district attorney was reasonable under the circumstances as they would be reckoned by a client paying the attorney's bill.

Id. (emphasis added).

The decision in Arbor Hill was further refined last summer in Simmons  v. New York City Transit Auth., 575 F.3d 170 (2d Cir. 2009), a disability discrimination lawsuit filed in Eastern District of New York by attorneys located in the Southern District of New York; as the Second Circuit acknowledged, in the Eastern District, "the prevailing hourly rates are substantially lower[]" than in the Southern District.  Id. at 172.  As Circuit Judge Walker wrote:

> We now hold that, when faced with a request for an award of higher out-of-district rates, a district court must first apply a presumption in favor of application of the forum rule. In order to overcome that presumption, a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result. In determining whether a litigant has established such a likelihood, the district court must consider experience-based, objective factors. Among the objective factors that may be pertinent is  counsel's special expertise in litigating the particular type of case,

if the case is of such nature as to benefit from special expertise. A litigant cannot overcome the presumption . . . by relying on the prestige or "brand name" of her selected counsel. Lawyers can achieve prestige and fame in numerous ways that do not necessarily translate into better results. The party seeking the award must make a particularized showing, not only that the selection of out-of-district counsel was predicated on experience-based, objective factors, but also of the likelihood that use of in-district counsel would produce a substantially inferior result.

Id. at 175-76.[10]   In rejecting the request of plaintiff's counsel for a higher hourly rate, the Second Circuit observed that defendant "should not be required to pay for a limousine when a sedan could have done the job." Id. at 177.

One month later, Judge Arterton relied extensively upon Simmons in Lawrence v. Richman Group of Connecticut, LLC, 660 F. Supp. 2d 292 (D. Conn.), clarified, 2009 WL 3425741 (D. Conn. Oct. 23, 2009), securities litigation in which defendants, like here, had been represented by counsel from Florida.  In a series of rulings filed after Arbor Hill but prior to Simmons, this Magistrate Judge awarded sanctions against plaintiff, applying the higher Florida hourly rates. Judge Arterton quoted from these rulings:

In these slug fest lawsuits, where the earth was not only scorched but virtually ripped open, which had a nearly unprecedented number of discovery motions, of dispositive motions, of sanctions motions, and of reconsideration motions, defendant[s] adequately [have] demonstrated that it was reasonable under the circumstances to retain its general litigation counsel from Florida. As talented as the attorneys at Cohen and Wolf are, given the factual and

_____

[10]As the Second Circuit explained:

Our interpretation of the exception to the forum rule provides a roadmap for district courts to follow, and guidance for litigants, and their counsel, to consider in taking cases and seeking attorney's fees. There are sound policy reasons for a clarified exception to the forum rule as opposed to a more nebulous test, among them predictability and economy. . . . [T]he instant case demonstrates that replacing a less defined, more opaque rule with the one we announce promotes cost-consciousness, increases the probability that attorneys will receive no more than the relevant market would normally permit, and encourages litigants to litigate with their own pocketbooks in mind, instead of their opponents'.

Id. at 176.

procedural complexity of these related lawsuits, defendant[s] [were] entitled to bring in extra muscle, that is, a law firm that had a long-standing understanding of the intricacies of defendant[s'] business and also an ample supply of attorneys to grind out the necessary work. And unlike <u>Arbor Hill</u>, securities claims are hardly intrinsically local matters, but rather ones where the legal market may well be defined by practice area.

Moreover, in comparing the rates of the junior partners and associates in Florida with those in Connecticut, the Florida rates are approximately one-third higher, which is not a startling divergence. . . . Therefore, there will be no reduction in hourly rates, as requested by Plaintiff.

660 F. Supp. 2d at 299-300 (citations omitted).  Judge Arterton held, based upon <u>Simmons</u>, that defendants had not "made a particularized showing that the participation of out-of-state counsel was likely necessary in order to achieve a better result or any likelihood that continued use of attorneys from the well-respected firm of Cohen and Wolf, L.P. would produce a substantially inferior result." <u>Id.</u> at 301 (internal quotations and citations omitted). Thus, defendants' attorney's fees application was reduced to reflect Connecticut rates.  <u>Id.</u>

In too many respects, the situation here is virtually identical to that in <u>Lawrence</u>. There is no doubt that the small army of attorneys from H&W, under the superb direction of Attorney Steinberg, who deserves all the accolades bestowed upon him (<u>see, e.g.</u>, Dkt. #541, Exhs. E-G; Dkt. #569, Exhs. 1, 2-3), came into this lawsuit under extremely difficult circumstances, immediately identified what discovery remained to be accomplished on their part and what discovery responses were deficient on Innis Arden's part, synthesized massive amounts of discovery in a highly technical and not easily penetrable field, and filed several motions with detailed and comprehensive briefs on fairly obscure areas of environmental law, with a highly favorable result for Pitney Bowes, all within a remarkably short period of time. However, as noteworthy as these accomplishments were, Pitney Bowes nonetheless has not overcome the strong presumption in <u>Simmons</u> and <u>Lawrence</u> that Pitney Bowes, as "a reasonable client would have selected out-of-district counsel because doing so would likely

(not just possibly) produce a substantially better net result[,]" with the requisite "particularized showing, not only that the selection of out-of-district counsel was predicated on experience-based, objective factors, but also of the likelihood that use of in-district counsel would produce a substantially inferior result." Simmons, 575 F.3d at 175-76; Lawrence, 660 F. Supp. 2d at 301.  The attorneys from H&W had the invaluable assistance of three able attorneys and two paralegal assistants from DP, which is the largest law firm in Connecticut, and which has many capable and well-respected attorneys.  (See, e.g., Dkt. #541, Jt. Aff't, at 11-13 & Exhs. N-Q; Dkt. #569, Exhs. 1, 3).  Both law firms provided the "extra muscle" necessary to plow through the discovery phase here, and then file the motions and comprehensive briefs that ended this litigation in Pitney Bowes' favor. Lawrence, 660 F. Supp. 2d at 300.  However, it is not at all clear, as required in Simmons, that the "use of in-district counsel," namely DP, "would [have] produce[d] a substantially inferior result." Simmons, 575 F.3d at 175-76; Lawrence, 660 F. Supp. 2d at 301.  To hold otherwise would be to suggest that DP, acting on its own without the assistance of H&W, would not have had the same positive result.  As the Second Circuit made clear in Simmons, "[a] litigant cannot overcome the presumption . . . by relying on the prestige or 'brand name' of [its] selected counsel. Lawyers can achieve prestige and fame in numerous ways that do not necessarily translate into better results." 575 F.3d at 176.  Using the motor vehicle analogy in Simmons, 575 F.3d at 177, while Hunton & Williams may be a top-of-the-line stretch limousine, Day Pitney is still a limousine nonetheless, and far from a mere sedan.  As such, plaintiff Innis Arden is correct that the hourly rate for H&W's most senior counsel will be reduced to that charged by the top senior counsel in this case in Connecticut, namely that of Attorney Francis J. Brady of MC at

$525/hour.[11]

### 2.  POST-MARCH 2009 HOURLY RATES BY H&W

In light of the conclusion reached in Section I.A.1 supra, there is no need to address this issue with respect to Attorney Steinberg.   Innis Arden has acknowledged that H&W's pre-March 2009 hourly rates "are comparable to those charged by [MC] for work on the same case – rates that [p]lainitiff concedes are reasonable for litigation before Connecticut courts." (Dkt. #568, Brief, at 17, n. 25; Dkt. #558, Exh. 1, ¶ 20).

Pitney Bowes originally had submitted a retention letter, dated October 1, 2008, that had not been signed by Pitney Bowes (Dkt. #541, Exh. A), giving rise to Innis Arden's argument that as a result, "presumably, [Pitney Bowes] did not agree to the terms contained therein." (Dkt. #568, Brief, at 16).  Pitney Bowes later produced a signed copy of this letter. (Dkt. #569, Exh. 1.A; see also Dkt. #569, Exh. 1, ¶¶ 12, 14).   Innis Arden objects to the increase in rates, which range from 11% to 60%, producing rates "well above the rates normally charged for similar litigation in Connecticut . . .," particularly during the "deep recession" experienced on the national and state level.    (Dkt. #568, Brief, at 16-17; Dkt. #558, Exhs. 1, 3).

As discussed above and in more detail in Section I.C. infra and Attachment A to this Ruling, besides Attorney Steinberg, five  attorneys from H&W expended hours in this file after March 1, 2009 – namely Attorneys Fewell, Riberio, Bilchik, Isani, and Brickey.  The increases for three of the attorneys are on the high side of reasonable – Attorney Fewell's increase from

---

[11]The Magistrate Judge recognizes that the Simmons decision places an out-of-district law firm in an inherently contradictory position – if it retains a local law firm without significant resources, the out-of-district law firm stands a better likelihood of a district court awarding it its higher out-of-district fees; however, if it retains a high powered local firm like Day Pitney, it is almost inevitable that a court will award it Connecticut rates.

$405 to $463 is fourteen percent and Attorney Bilchik's increase from $195 to $230 is nearly eighteen percent.   In contrast, Attorney Isani's increase from $300 to $405 is thirty-five percent, Attorney Ribeiro's increase from $215 to $342 is a startling fifty-nine percent,  and Attorney Brickey's increase from $195 to $322 is a remarkable sixty-five percentage.[12] While these higher rates may not be out of line with what was charged by DP, the increases in the rates of Attorneys Ribeiro and Isani are inconsistent with current economic conditions. Therefore, their increases are limited to the same percentage as Attorney Bilchik, namely eighteen percent, so that the Magistrate Judge will apply to a post-March 1, 2009 hourly rate of $254 to Attorney Ribeiro, of $354 to Attorney Isani, and of $230 to Attorney Brickey.  The hourly rate for Ms. Moon after March 1, 2009 is addressed in Section I.A.4 <u>infra</u>.

### 3.  HOURLY RATES OF DP

Innis Arden further argues that the hourly rate charged by Attorney Colbert, DP's lead partner on this file, should be reduced by $50, from $450 to $400, and that the hourly rate of Attorney DePanfilis should be reduced by $75, from $315 to $240, in that other associates in this case with two to six years of experienced charged between $175 and $240.  (Dkt. #568, Brief, at 19; Dkt. #558, Exhs. 1, 3).  The various affidavits submitted by Pitney Bowes suggest otherwise (Dkt. #541, Exhs. N-Q; Dkt. #569, Exhs. 1, 3), and there will be no reduction in the hourly rates requested by attorneys from DP.

### 4.  HOURLY FEE FOR PARALEGAL ASSISTANTS

Innis Arden also argues that defendant Pitney Bowes has requested hourly rates for paralegal support between $150 and $200, which should be reduced to $75 to $150.  (Dkt. #568, Brief, at 19; Dkt. #558, Exh. 1, ¶ 15).   The maximum hourly rate for paralegal

---

[12]Attorney Isani only expended .5 hours after March 1, 2009, so her large increase would not be of much significance.

assistants is reduced to the rate charged by DP, namely $160.

B.  SPECIFIC ENTRIES BY PITNEY BOWES' ATTORNEYS

The May 2009 Sanctions Ruling permitted Pitney Bowes to recover attorney's fees and costs as follows:

> (1) the preparation of all motions and briefs giving rise to the July 2008 Sanctions Ruling; (2) preparation for and deposing plaintiff's experts; (3) defendant's own expenses in having [their own experts] review plaintiff's expert opinions, based upon incomplete data, and (4) the preparation of all motions and briefs regarding plaintiff's expert discovery issues from the date plaintiff served its expert reports, including the instant motion.

(At 14).[13]  Innis Arden has asserted general and specific objections to categories of attorney's fees and costs, as outside the scope of the May 2009 Sanctions Ruling or excessive. (Dkt. #568, Brief, at 19-35; Dkt. #558, Exhs. 4-13, 23).   Besides asserting that Innis Arden's 137 pages of exhibits is an attempt "to skirt" the forty-page limit for briefs under our Local Rules, Pitney Bowes argues that the general and specific objections should be rejected. (Dkt. #569, at 5-10).[14]

1. PREPARATION OF ALL MOTIONS AND BRIEFS GIVING RISE TO JULY 2008 SANCTIONS RULING

Pitney Bowes seeks attorneys' fees and costs in the amount of $35,637.50 for this category, all of which was generated by P&C, as this occurred before H&W or DP became involved in this litigation.  (Dkt. #541, Jt. Aff't, at 5-6; Whitney Aff't & Exh.).  Innis Arden

---

[13]Innis Arden correctly noted the typographical error in the Magistrate Judge's ruling.  (Dkt. #568, Brief, at 7, 26).

[14]While Pitney Bowes is correct that it would have been preferable for Innis Arden to have sought permission to file an oversized brief, the Magistrate Judge nonetheless has paid careful attention to the general and specific objections, as indicated in the discussion below.

Pitney Bowes further requests an opportunity to respond to any issues that it did not have an opportunity to address in its ten-page reply brief.  (Dkt. #569, at 7, n.12).  In that the briefs and exhibits regarding these two motions are nearly four inches thick, no further briefing is invited. Pitney Bowes, of course, is free to file whatever Motion for Reconsideration it deems necessary.

requests a reduction of $8,775.00 to $26,862.50, on the grounds that there are items outside the scope of the May 2009 Sanctions Ruling, particularly entries after July 14, 2008, and research for motions that were never filed.  (Dkt. #568, Brief, at 21-22; Dkt. #558, Exh. 4).  As explained by Pitney Bowes, the post-July 14, 2008 entries are relevant with respect to other categories listed in the May 2009 Sanctions Ruling.  (Dkt. #569, at 10; see also Dkt. #541, Jt. Aff't, at 6, n.11; Whitney Aff't).  Innis Arden is correct, however, with respect to a limited number of entries – 3.2 hours by Attorney Youngling on May 1, 2 and 5, 2008 regarding a potential Rule 11 Motion, never filed, and 7.9 hours by Attorney Whitney and 5.0 hours by Attorney Sheathlem on January 8, and May 5, 6, 7, and 8, 2008 for a Daubert challenge to Dr. Pignatello's expert report, which motion never was filed at that time.  (Dkt. #558, Exh. 4).   There are no reductions for any other entries. Thus, the attorney's fees and costs awarded for P&C's work are as follows in Table 6:

**Table 6**

| Attorney | Hours | Hourly Rate | Subtotal |
|---|---|---|---|
| Diane W. Whitney | 68.1 | $350 | $23,835.00 |
| Megan M. Youngling | 12.7 | $175 | $2,222.50 |
| Kurt Sheathelm | 36.7 | $150 | $5,505.00 |
| TOTALS | 117.5 | | $31,562.50 |

## 2. PREPARATION FOR AND DEPOSING PLAINTIFF'S EXPERTS

For this category, Pitney Bowes has included entries for two topics: (1) preparation for and attendance at Dr. Pignatello's deposition on February 25, 2009; and (2) preparation for and attendance at Dr. Kaczmar's depositions on February 26, 2009 and March 4, 2009. (Dkt. #541, Jt. Aff't, at 6 & Exhs. C-D).  As reflected on H&W's computer-generated time sheets, H&W personnel expended 116.60 hours, totaling $42,739.00, for the Pignatello deposition, and expended 174.30 hours, totaling $58,553.20, for the Kaczmar depositions. (Dkt. #541, Exh. C).   As reflected on DP's computer-generated time sheets, DP personnel expended 132.90 hours, totaling $34,681.00, for the Pignatello deposition, and expended 110.00 hours, totaling $30,422.00, for the Kaczmar depositions.  (Dkt. #541, Exh. D).

Not surprisingly, Innis Arden describes Pitney Bowes' request for $166,395 in fees for 566.3 hours spent by seven attorneys and seven paralegal assistants for three days of depositions, averaging 189 hours of attorney/paralegal preparation per day, as "excessive," particularly when Pitney Bowes "stridently argued" in its Daubert motions that "the two expert reports were identical, included the same conclusions and relied on the same set of documents."  (Dkt. #568, Brief, at 22-23 & n.36; see also Dkt. #558, Exh. 5).  Innis Arden further has observed that in their entries, both law firms refer generally to preparation of "[p]laintiff's experts," without differentiation between the two.  (Dkt. #568, Brief, at 23). Moreover, as Innis Arden has indicated, both expert reports were short – Dr. Pignatello's was only two pages in length, while Dr. Kaczmar's report was only four pages long.  (Dkt. #568, Brief, at 23; Dkt. #558, Exhs. 19-20).  As further pointed out by Innis Arden, H&W and DP had the benefit of three years of work done by P&C, with whom they consulted frequently. (Dkt. #568, Brief, at 24; Dkt. #558, Exh. 5).  Innis Arden therefore has requested a forty percent reduction of all time claimed by Pitney Bowes for these two items, reducing the fee

18

to $76,624.  (Dkt. #568, Brief, at 25; Dkt. #558, Exh. 5).[15]

In its reply brief, Pitney Bowes argues that the number of hours spent was "reasonable and necessary," despite the brevity of the two expert reports, because its attorneys "had to conduct considerable review and analysis of tens of thousands of pages of unorganized and incomplete documents."  (Dkt. #569, at 6-7). According to Pitney Bowes, in preparing for these depositions, counsel needed "to develop intricate and detailed questions without the benefit of complete scientific files and absent significant and critical scientific tests," producing an outline for the Kaczmar deposition that was more than eighty pages long (with more than fifty exhibits) and an outline for the Pignatello deposition that was more than thirty pages long (with more than twenty exhibits).  (Dkt. #569, at 7).

There is little dispute that these two depositions were among the most critical in this litigation, for which Pitney Bowes needed to be fully prepared.  As such, the Magistrate Judge will not apply any discount to Pitney Bowes' hours, even if the number of hours is rather startling.

As reflected in Innis Arden's Exh. 5, Innis Arden also objects to time spent by Fewell, Moon, DePanfilis, and Steinberg between January 29, 2009 and March 4, 2009 regarding plaintiff's compliance with the National Contingency Plan ["NCP"]; to time spent issuing two identical subpoenas duces tecum to plaintiff's expert witnesses by Moon, Ribeiro, DePanfilis, and Colbert between January 14, 2009 and January 29, 2009; to time spent on unrelated matters (including the voluntary dismissals of co-defendants, unrelated discovery motions, and a motion to compel an additional day of Kaczmar's deposition, which was never filed) by Fewell, Zelesnick, Colbert, Ribeiro, DePanfilis, Bilchik, Steinberg, and Moon from December

---

[15]The figures in Exh. 5 are slightly different – a request for a 35% reduction of $97,771.20, for a balance of $73,624.20.

29, 2008 through March 4, 2009; general case preparation by Bilchik, DePanfilis, Colbert, Donaire, and Zelesnick, from February 5, 2009 through March 29, 2009; for a second attorney at the expert depositions on February 25-26, and March 4, 2009; for multiple participants in the same conference call with consultants on February 5 and 8, 2009; and for an inconsistent time entry on February 18, 2009.  (Dkt. #558, Exh. 5).

After a careful review of all these entries, as they appear in Exhibit 5, the Magistrate Judge agrees that for the NCP entries, only six items do not relate to Pitney Bowes' preparation for two expert depositions – Attorney Fewell's entries on January 29, 2009 should be reduced from 1.8 hours to .8 hours and on February 24, 2009 should be reduced from 1.2 hours to .5 hours; and Moon's entries of .2 hours on February 5, 2.9 hours on February 10, 4.2 hours on March 4, and .2 hours again on March 4, 2009 will not be included.   Thus, Attorney Fewell's hours are reduced by 1.7 hours and Moon's entries are reduced by 7.5 hours.   The Magistrate Judge further agrees that the 7.4 hours spent by Moon, Ribeiro, DePanfilis, and Colbert from January 14, 2009 through January 29, 2009 on the preparation and issuance of two identical subpoenas duces tecum are excessive, and will be reduced by fifty percent.   Therefore, Moon's hours are reduced by .6 hours, Ribeiro's hours are reduced by 1.85 hours, DePanfilis' hours are reduced by .6 hours, and Colbert's hours are reduced by .3 hours.   Regarding Innis Arden's claim that there were time entries unrelated to preparation of depositions, the Magistrate Judge agrees that of the thirty-five entries, five entries should be discarded – Colbert on February 13, 2009 for.6 hours, and DePanfilis on February 16, 17, 19, and 23, 2009, for .2 hours, .1 hours, .2 hours, and .1 hours, respectively.   The following eight entries should be reduced: Fewell on December 29, 2008 from .9 to .45 hours and on February 3, 2009 from 1.3 hours to .3 hours; Zelesnick on January 5 and 6, 2009 from 1.0 hours to .5 hours and from .4 hours to .2 hours, respectively; Ribeiro on February 3, 2009

from .9 hours to .45 hours; and DePanfilis on February 16 (two entries) and 26, 2009 from .4 hours to .2 hours, .3 hours to .15 hours, and 1.3 hours to .65 hours, respectively. Therefore, Colbert's hours are reduced by .6 hours, DePanfilis' hours are reduced by 1.6 hours, Fewell's hours are reduced by .75 hours; and Zelesnick's hours are reduced by .7 hours; Ribeiro's hours are reduced by .45 hours.[16]

As to Innis Arden's argument that certain time entries related to "general case management," of the twenty-two entries, the Magistrate Judge agrees that five of them should not be considered – DePanfilis' hours on February 9, 21, 23 and 27, 2009. for .3 hours, .2 hours, .1 hours, and .1 hours, respectively, and Colbert's hours on February 10, 2009 for .7 hours.   Therefore, DePanfilis' and Colbert's hours are both reduced by .7 hours.[17]

Given the complexity of this litigation, there is no merit to Innis Arden's arguments that there should be an eighty percent reduction for Attorney DePanfilis' attendance at these depositions, and to the elimination of multiple entries by people who attended the same conference call with consultants.  However, it does appear that Attorney Steinberg's entry on February 18, 2009 should be reduced by 2.1 hours, to .4 hours.

### 3.  DEFENDANT'S OWN EXPENSES IN HAVING THEIR OWN EXPERTS REVIEW PLAINTIFF'S EXPERT OPINIONS, BASED UPON INCOMPLETE DATA

For this category, Pitney Bowes has included entries on three topics: (1) review of Dr. Pignatello's Expert Report and Document Production; (2) review of Dr. Kaczmar's Expert Reports and Document Production; and (3) review of Innis Arden's late production after the

---

[16]Innis Arden is correct that some of the entries relate to sanctions, rather than preparation for depositions, but they have not been eliminated since they would be included in Section I.B.4 infra.

[17]As in note 16 supra, Innis Arden is correct that some of the entries relate to sanctions, rather than preparation for depositions, but they have not been eliminated since they would be included in Section I.B.4 infra.

close of discovery on January 16, 2009.  (Dkt. #541, Jt. Aff't, at 6).  As reflected on H&W's computer-generated time sheets, H&W personnel expended 12.8  hours, totaling $3,876.50 in reviewing Dr. Pignatello's Expert Report and Document Production; 40.3 hours, totaling $7,600.40 in reviewing Dr. Kaczmar's Expert Report and Document Production; and 93.8 hours, totaling $20,554.70 in reviewing Innis Arden's late production after the close of discovery on January 16, 2009, for a total of $32,031.60 on these three items.  (Dkt. #541, Exh. C).  As reflected on DP's computer-generated time sheets, DP personnel expended 22.5 hours, totaling $7,085.00 in reviewing Dr. Pignatello's Expert Report and Document Production; 24.9 hours, totaling $7,363.00 in reviewing Dr. Kaczmar's Expert Report and Document Production; and 4.6 hours, totaling $1,367.50 in reviewing Innis Arden's late production after the close of discovery on January 16, 2009, for a total of $15,815.50 on these three items.  (Dkt. #541, Exh. D).

Innis Arden agrees that expert expenses in the amount of $15,552 are "reasonable under this request."  (Dkt. #568, Brief, at 26).[18]  However, it argues that time entries by Pitney Bowes' attorneys are outside the scope of the May 2009 Sanctions Ruling, and that a "close review of the specific time entries . . . indicates that many of [them] belong in other categories."   (Dkt. #568, Brief, at 27).  As Pitney Bowes has pointed out, the May 2009 Sanctions Ruling was not limited to only Pitney Bowes' expert  expenses, but naturally includes the time its attorneys spent reviewing same.  (Dkt. #569, at 9).  A close review of Pitney Bowes' entries from February 6, 2009 through May 13, 2009 does reveal two entries that are totally unrelated – Ribeiro's entry on February 23, 2009 for 2.8 hours, and Moon's entry on May 7, 2009 for .1 hours.

---

[18]See Section I.E infra.

### 4.  PREPARATION OF ALL MOTIONS AND BRIEFS REGARDING PLAINTIFF'S EXPERT DISCOVERY ISSUES FROM THE DATE PLAINTIFF SERVED ITS EXPERT REPORTS, INCLUDING SANCTIONS MOTIONS

For this category, Pitney Bowes has included entries on six topics: (1) Motion to Strike Dr. Kaczmar's Supplemental Report; (2) Motion for Sanctions against Innis Arden for Spoliation of Evidence; (3) Motion for Sanctions against Innis Arden for Discovery Abuse; (4) Motion to Preclude Testimony and Report of Joseph Pignatello; (5) Motion to Preclude Testimony and Report of Swiatoslav Kaczmar; and (6) Application for Attorney's Fees and Costs.  (Dkt. #541, Jt. Aff't, at 7).  As reflected on H&W's computer-generated time sheets, H&W personnel expended 46.0 hours on the Motion to Strike Dr. Kaczmar's Supplemental Report, totaling $13,886.00; 455 hours on its Motion for Sanctions against Innis Arden for Spoliation of Evidence, totaling $159,906.10; 267.2 hours on the Motion for Sanctions against Innis Arden for Discovery Abuse, totaling $83,443.10; 58.9 hours on its Motion to Preclude Testimony and Report of Joseph Pignatello, totaling $17,378.00; 190.8 hours on the Motion to Preclude Testimony and Report of Swiatoslav Kaczmar, totaling $54,132.10; and 89.2 hours on this Application for Attorney's Fees and Costs, totaling $17,662.50, for a total of $346,407.80 for these six items.  (Dkt. #541, Exh. C).

As reflected on DP's computer-generated time sheets, DP personnel expended 21.8 hours on the Motion to Strike Dr. Kaczmar's Supplemental Report, totaling $8,191.50; 46.6 hours on the Motion for Sanctions against Innis Arden for Spoliation of Evidence, totaling $13,302.00; 22.9 hours on the Motion for Sanctions against Innis Arden for Discovery Abuse, totaling $6,878.00; 110.5 hours on its Motion to Preclude Testimony and Report of Joseph Pignatello, totaling $38,893.00; 6.3 hours on the Motion to Preclude Testimony and Report of Swiatoslav Kaczmar, totaling $2,308.50; and 74.0 hours on this Application for Attorney's Fees and Costs, totaling $19,307.50, for a total of $88,880.50 for these six items.  (Dkt. #541,

Exh. D).

In its brief in opposition, Innis Arden argues that two of the motions – namely the Motion to Strike the Supplemental Kaczmar Report and Motion for Sanctions against Innis Arden for Spoliation of Evidence – fall "completely outside the scope of the [May 2009] Sanction[s] Ruling" and that only part of the fees should be awarded for the remaining four motions.  (Dkt. #568, Brief, at 28-35).   In its reply brief, Pitney Bowes contends that the motions and briefs regarding spoliation "undoubtedly" was included in the May 2009 Sanctions Ruling because neither Pitney Bowes, nor its experts, could "verify [Innis Arden's] experts' opinions due to the fact that all of the samples had been destroyed and the scientific files were incomplete and undecipherable."  (Dkt. #569, at 9-10).

<u>a.  MOTION TO STRIKE DR. KACZMAR'S SUPPLEMENTAL REPORT</u>

Innis Arden argues that Pitney Bowes' Motion to Strike Dr. Kaczmar's Supplemental Report falls outside the scope of the May 2009 Sanctions Ruling because it concerns plaintiff's compliance with NCP, and the motion did not request an award of fees; in addition, when Pitney Bowes filed its Motion for Sanctions, it did not include the filing of the Supplemental Report as a basis for imposing sanctions.   (Dkt. #568, Brief, at 28-29).[19]  A review of Pitney Bowes' motion and brief (Dkts. ##378-79) clearly indicates that this motion addressed not only at the NCP issue, but Innis Arden's continuing difficulties in abiding with discovery obligations.  This Magistrate Judge's Ruling on Defendant Pitney Bowes, Inc.'s Motion to Strike Supplemental Expert Report of Dr. Swiatoslav Kaczmar, filed February 23, 2009 (Dkt. #400), also recounts these same difficulties.  (At 2-3, 4-7).  However, as Innis Arden appropriately

---

[19]Innis Arden also argues that the time spent on this motion was excessive, requesting a twenty percent reduction, and that ten of the entries were unrelated to this motion.  (Dkt. #558, Exh. 7).

observed, Pitney Bowes did not request attorney's fees in this motion and brief (Dkts. ##378-79),[20] nor did it include this particular discovery incident in its twenty-two page recitation of its discovery grievances against Innis Arden in Pitney Bowes' brief in support of its' Motion for Sanctions Against Plaintiff for Discovery Abuse, filed March 13, 2009.  (Dkt. #421, at 1-22).[21] As a result, this event is not discussed in the May 2009 Sanctions Ruling.

Therefore, for these reasons, the Magistrate Judge agrees that Pitney Bowes' time spent on the Motion to Strike Supplemental Expert Report of Dr. Swiatoslav Kaczmar does not fall within the scope of the May 2009 Sanctions Ruling, so that the 46.0 hours spent by H&W on this motion (totaling $13,886.00) and the 21.8 hours expended by DP on the motion (totaling $8,191.50) are excludable.[22]

### b. MOTION FOR SANCTIONS AGAINST INNIS ARDEN FOR SPOLIATION OF EVIDENCE

Innis Arden similarly argues that Pitney Bowes' Motion for Sanctions Against Innis Arden for Spoliation falls outside the scope of the May 2009 Sanctions Ruling because this issue was presented to and decided by Judge Arterton; Pitney Bowes had requested the "full range of sanctions" in that motion, including dismissal, attorney's fees and costs, and preclusion, and Judge Arterton held that the appropriate sanction was preclusion of all

---

[20]From a review of the 104-page electronic docket sheet, it does not appear that Pitney Bowes sought sanctions against Innis Arden until it filed the Motion for Sanctions against Innis Arden for Discovery Abuse on March 13, 2009.  (Dkt. #421).

[21]Pitney Bowes also did not address this issue in its ten-page reply brief.  (Dkt.#569; but see note 14 supra).

[22]H&W's computer-generated time sheets reflect the following entries for this item: Fewell – 7.3 hours; Brickey – 1.0 hour; Steinberg – 7.4 hours; Bilchik – 3.6 hours; and Ribeiro – 26.7 hours.  (Dkt. #541, Exh. C).  DP's computer-generated time sheets reflect the following: Colbert – 5.8 hours; DePanfilis – 3.1 hours; Shapiro – 12.1 hours; and Zelesnick – .8 hours.  (Dkt. #541, Exh. D).

sampling evidence, not attorney's fees.   (Dkt. #568, Brief, at 29-30).[23]   As Innis Arden has

observed, Pitney Bowes did not seek reconsideration from Judge Arterton for the imposition

of attorney's fees, and as such "is attempting to gain what it did not receive from Judge

Arterton."  (Id. at 30).   In addition, Innis Arden argues that "spoliation was not an expert

discovery issue arising after [p]laintiff served its expert reports[,]" but rather "the failure to

preserve soil and sediment samples and to preserve the opportunity to 'date test'

contaminated sediment [occurred] . . . well before this action was started. . . " (Id. at 31).[24]

    In its reply brief, Pitney Bowes has responded that the spoliation motion "undoubtedly"

falls under the rubric of the May 2009 Sanctions Ruling because such motion "was specifically

based on [Innis Arden's] expert discovery issues," giving rise to the situation wherein neither

Pitney Bowes nor its experts could "verify [Innis Arden's] experts' opinions due to the fact that

all of the samples had been destroyed and the scientific files were incomplete and

undecipherable."  (Dkt. #569, at 9-10).

    Pitney Bowes is quite correct that the spoliation motion concerns actions, or more

appropriately inaction, by Innis Arden's experts, but the experts' activity at issue is not true

"discovery."   As explained in great detail by Judge Arterton in her Spoliation Ruling, the

environmental consulting firm of O'Brien & Gere ["OBG"] was retained by Innis Arden in

January 2005, three months after Innis Arden discovered the PCB's on its property; by

summer 2005, Innis Arden and OBG began the process of taking samples, and of notifying

_____

[23]As Innis Arden recognized, the sanction of preclusion "had an impact far greater than
mere preclusion of evidence," in that it "resulted in the Court's subsequent decision precluding the
experts' testimony, which in turn resulted in the granting of summary judgment for [d]efendants."
(Id. at 29-30).

[24]Innis Arden also argues that the fees submitted by Pitney Bowes are "excessive" and
duplicative, and that there are multiple entries unrelated to the spoliation motion.  (Id. at 31-32;
Dkt. #558, Exh. 8).

Pitney Bowes, Whisper Capital, LLC, and others of the situation and providing them the opportunity to "share the data" from the analysis of the samples.  257 F.R.D. at 335-37. Despite a "hold" having been placed on the samples, these samples, as well as additional samples taken during remediation and after this lawsuit was commenced in August 2006, were destroyed.  Id. at 337-39, 340-41.   While the sanctions that can be imposed for spoliation are governed by FED. R. CIV. P. 37(b),which governs discovery, as well as the court's "inherent power to control litigation[,]" id. at 339 (citation omitted), a spoliation motion concerns not the disclosure of relevant evidence, but rather the preservation and retention of relevant evidence.  See 257 F.R.D. at 339.  As such, while there admittedly are overlapping concerns regarding discovery abuses and spoliation, the two are not necessarily identical.  In some cases, where evidence is destroyed while the litigation is pending, spoliation can be considered to be within the rubric of "discovery."   However, in this case, the evidence was destroyed even before this lawsuit had been filed.  Here, even had Innis Arden been fully compliant with all of its discovery obligations from the very first discovery request made by defendants, the spoliation issue still would have been present, in light of OBG's pre-litigation actions.[25]

_____

[25]In Pitney Bowes' brief in support of its Motion for Sanctions Against Plaintiff for Discovery Abuse, the only mention of spoliation is a brief reference to the spoliation motion, filed that same day.  (Dkt. #421, at 3 & n.4).

There is also some merit to Innis Arden's argument that Judge Arterton could have imposed attorney's fees in her Spoliation Ruling, but instead imposed the "severe sanction" of preclusion, without any discussion of attorneys' fees.  257 F.R.D. at 342.

In its Motion for Sanctions Against Plaintiff for Discovery Abuse, Pitney Bowes requested dismissal under FED. R. CIV. P. 41, "or at a minimum, preclu[sion of] the reports of [Innis Arden's] proffered experts, Joseph Pignatello and Swiatoslav Kaczmar, and exclu[sion of] any expert testimony on behalf of [Innis Arden], . . . and award . . . [of] attorneys' fees and costs. . . ."  (Dkt. #421, at 1, 36-37). In the discussion of appropriate sanctions in the May 2009 Sanctions Ruling, filed six days after Judge Arterton's Spoliation Ruling, this Magistrate Judge imposed attorney's fees and costs, but reserved the opportunity to impose "more severe sanctions" in the event that

Therefore, under the unique circumstances of this case, the time expended by Pitney Bowes for the spoliation motion is not covered by the May 2009 Sanctions Ruling.[26]

### c.  MOTION FOR SANCTIONS AGAINST INNIS ARDEN FOR DISCOVERY ABUSE

Innis Arden argues that the time expended on the sanctions motion and related briefing was "excessive," and ought to be reduced by thirty percent, and also objects to various entries as not relating to the sanctions motions.  (Dkt. #568, Brief, at 32; Dkt. #558, Exh. 9).[27]  Innis Arden contends that Pitney Bowes' request for $90,321.10 for this item ought to be reduced by $44,122.50 to $46,198.60.  (Id.).[28]

Of the thirty-two entries in Exh. 9, the Magistrate Judge agrees that twenty of them are not related to the sanctions motion – Moon's entry on October 21, 2008 for 1.6 hours; Moon's entries on November 24, 25, and 26, 2008 for 2.3 hours, 3.8 hours, and 1.7 hours, respectively;[29] Moon's entry on January 5, 2009 for 2.8 hours; Ribeiro's entry on January 28,

---

Judge Arterton did not grant Pitney Bowes' pending Daubert motions or Motion for Summary Judgment.  (At 14).   Different objectives were served by the varying sanctions imposed.

[26]H&W's computer-generated time sheets reflect the following entries for this item: Fewell – 1.5 hours; Moon – 20.4 hours at lower rate & 55.60 hours at higher rate; Donaire – 15.9 hours; Isani –51.4 hours at lower rate & 63.4 hours at higher rate; Steinberg – 92.1 hours; Bilchik – 10.5 hours at lower rate & 77.0 hours at higher rate; Hernandez – 3.6 hours; Ribeiro – 1.3 hours at lower rate & 61.0 hours at higher rate; and Julin – 1.3 hours.  (Dkt. #541, Exh. C).

As set forth in Section I.A.4 supra, Moon's rate is set at $160/hour, without regard to any increase after March 1, 2009.

DP's computer-generated time sheets reflect the following: Colbert – 5.3 hours; DePanfilis – 27.8 hours; and Beverley – 13.5 hours.  (Dkt. #541, Exh. D).

[27]Innis Arden's brief contains a typographical error, in that it refers to Exh. 8 instead of Exh. 9.

[28]This issue is not addressed in Pitney Bowes' ten-page reply brief.  (Dkt. #569; but see note 14 supra).

[29]These three entries occurred in 2008, not 2009.

2009 for .2 hours; Isani's entry on January 29, 2009 for .9 hours; Moon's entries on February

3, 2009 for .4 and .6 hours; Donaire's entry on March 16, 2009 for 2.4 hours; Bilchik's entry

on April 14, 2009 for .6 hours; Ribeiro's entry on April 27,2009 for .3 hours; DePanfilis' entry

on May 15, 2009 for .2 hours; Zelesnick's entry on June 12, 2009 for .5 hours; Steinberg's

entry on February 13, 2009 for 1.3 hours; Steinberg's entry on March 2, 2009 for .5 hours;

Hernandez's entry on March 11, 2009 for 2.8 hours; Moon's entry on May 6, 2006 for .2

hours; Ribeiro's entry on May 18, 2009 for .3 hours; and Donaire's entry on March 13, 2009

should be reduced to 2.7 hours.

Therefore, Moon's entries are reduced by 13.4 hours, Ribeiro's entries are reduced by

.2 hours under the lower rate and .6 hours under the higher rate; Isani's entries are reduced

by .9 hours under the lower rate; Donaire's hours are reduced by 4.0 hours; Bilchik's entries

are reduced by .6 hours under the higher rate; DePanfilis' rates are reduced by .2 hours;

Zelesnick's entries are reduced by .5 hours; Steinberg's entries are reduced by 1.8 hours; and

Hernandez's entries are reduced by 2.8 hours.  No other reductions are necessary.

### d.  DAUBERT MOTIONS

Innis Arden contends that usually Daubert motions are evidentiary motions, rather

than discovery motions, but concedes that in this case

> certain issues raised in [Pitney Bowes'] motions arose directly from the
> discovery issues raised in its motion for [s]anctions. Specifically, [p]laintiff's
> causation case was reliant in significant part on the evidence of contamination
> found on its property.  The conduct found sanctionable by the Court involved,
> in significant part, the production of lab reports and the adequacy of the
> expert's disclosure of the documents they relied on.

(Dkt. #568, Brief, at 33).   As a result, Innis Arden requests a percentage reduction based on

the number of issues in the motions that were not affected by the sanctioned conduct.[30]

### i.   MOTION  TO PRECLUDE TESTIMONY AND REPORT OF JOSEPH  PIGNATELLO

For Dr. Pignatello, Pitney Bowes moved to preclude the expert's report and testimony on three grounds: (1) he was not qualified to render an opinion on the "identification or migration" of PCB's because he "admittedly has no experience" in that field (Dkt. #422, Brief, at 4-8); (2) his "opinions lack a reliable scientific basis, and are based on unsupported assumptions and speculation" (Dkt. #422, Brief, at 8-16); and (3) his report and testimony are "duplicative" of the opinions offered by Dr. Kaczmar, Innis Arden's "primary expert." (Dkt. #422, Brief, at 16-18).   Innis Arden suggests that because only the middle issue – lack of a reliable scientific basis – "implicates a number of expert discovery issues," Pitney Bowes should recover only one-third of its fees for this motion.  (Dkt. #568, Brief, at 33-34).[31]  Innis Arden also argues that the time expended was "excessive in relation to the length and complexity of the motion and briefing," warranting an additional thirty percent reduction, and further objects to thirty-one entries as being unrelated to the <u>Daubert</u> motion directed at Pignatello.  (Dkt. #558, Exh. 10).   According to Innis Arden, Pitney Bowes' request of $56,2671.00 for this item ought to be reduced by $45,802.75, to $10,468.25.  (Dkt. #558, Exh. 10).

The Magistrate Judge agrees that eighteen of the entries are not related to the <u>Daubert</u> motion, in that they concern general trial preparation, the spoliation and/or summary

---

[30]Pitney Bowes' ten-page reply brief does not address these motions.  (Dkt. #569; <u>but see</u> note 14 <u>supra</u>).

[31]In its Exh. 10, Innis Arden requests a thirty percent reduction, followed by another fifty percent reduction, for a combined reduction of sixty-five percent, which is very close to the sixty-seven percent reduction sought in the brief.  (Dkt. #558, Exh. 10).

judgment motions, and a Motion to Strike that apparently was not filed – DePanfilis' entries on May 25 and 31, 2009 of 4.8 hours and 6.3 hours, respectively; DePanfilis' entries on April 23 and 24, 2009 of 4.6 hours and 3.40 hours, respectively; DePanfilis' entries on May 4 and 14, 2009 of 7.6 hours and 6.5 hours, respectively; Isani's entry on January 26, 2009 of .4 hours; Moon's entry on February 23, 2009 of 2.3 hours; Bilchik's entry on March 4, 2009 of 1.9 hours; Donaire's entries on April 15, 17 and 20, 2009 of 1.6 hours, .5 hours, and 1.3 hours, respectively; and Donaire's entry on March 11, 2009 should be reduced to 1.4 hours and Ribeiro's entry that same day should be reduced to .15 hours.

Therefore, DePanfilis' entries are reduced by 33.2 hours, Isani's entries are reduced by .4 hours; Moon's entries are reduced by 2.3 hours at the lower rate; Bilchik's entries are reduced by 1.9 hours at the higher rate; Ribeiro's entries are reduced by .15 hours at the higher rate; and Donaire's hours are reduced by 5.8 hours.

As to the overall reduction, Innis Arden is correct that only one of the three arguments made in Pitney Bowes' Daubert motion directed at Dr. Pignatello arose out of discovery abuses; however, nearly fifty percent of the pages of legal arguments in Pitney Bowes' brief for that motion was devoted to this issue.  (Dkt. #422, Brief, at 8-16).  More significantly, in Judge Arterton's Summary Judgment/Daubert Ruling, this is the only aspect of the motion discussed.  629 F. Supp. 2d at 187-91.  Therefore, there will be no further reduction in Pitney Bowes' hours, other than for the unrelated entries.

### ii. MOTION TO PRECLUDE TESTIMONY AND REPORT OF SWIATOSLAV KACZMAR

For Dr. Kaczmar, Pitney Bowes moved to preclude the expert's report and testimony on five grounds: (1) that his expert testimony was "contradictory, speculative, conjectural, and irreconcilable with evidence presented in this case" (Dkt. #424, at 10-13); (2) that his

expert testimony was based "on an unsound methodology that was performed in a haphazard and unreliable fashion" (Dkt. #424, at 13-19); (3) that his expert conclusions "were based on an incomplete factual record and failed to eliminate or address obvious alternative factors" (Dkt. #424, at 19-32); (4) that his opinion lacked "a testable hypothesis" for Pitney Bowes to apply (Dkt. #424, at 32-36); and (5) that Dr. Kaczmar was not "a neutral expert and his objectivity [was] compromised because OBG [had] a financial stake in this litigation[.]" (Dkt. #424, at 36-39).   Innis Arden argues that because the second and fourth issues "implicate conduct found sanctionable by the Court[,]" only one-half of the fees incurred in preparing the motion and brief are recoverable.  (Dkt. #568, Brief, at 34).[32]   Innis Arden similarly argues that the time expended was "excessive in relation to the length and complexity of the motion and briefing," warranting an additional thirty percent reduction, and further objects to twenty-seven entries as being unrelated to the Daubert motion directed at Dr. Kaczmar. (Dkt. #558, Exh. 11).  According to Innis Arden, Pitney Bowes' request of $56,440.60 for this item ought to be reduced by $45,278.00, to $13,862.60.  (Dkt. #558, Exh. 11).

The Magistrate Judge agrees that eleven of the entries are not related to the Daubert motion, in that they concern the spoliation and/or summary judgment motions, and a Motion to Strike that apparently was not filed – DePanfilis' entry on April 8, 2009 for .2 hours; Donaire's entries on April 20, 21 (both), 22, and 23, 2009, for 1.1 hours, .6 hours, 2.9 hours, 2.6 hours, and 2.4 hours, respectively; Steinberg's entry on May 2, 2009 for .7 hours; Moon's entry on May 4, 2009 for .7 hours; Ribeiro's entry on May 4, 2009 for .4 hours; and Ribeiro's

---

[32]In its Exh. 11, Innis Arden requests a thirty percent reduction, followed by another fifty percent reduction, for a combined reduction of sixty-five percent.  (Dkt. #558, Exh. 11).

entry on March 3, 2009 and Isani's entry on March 11, 2009 are both reduced to .2 hours.[33]

Therefore, DePanfilis' entries are reduced by .2 hours; Donaire's entries are reduced by 9.6 hours; Ribeiro's entries are reduced by .6 hours at the higher rate; Isani's entries are reduced by .2 hours at the higher rate; Steinberg's entries are reduced by .7 hours; and Moon's entries are reduced by .7 hours.[34]

As to the overall reduction, Innis Arden argues that only two of the five arguments made in Pitney Bowes' Daubert motion directed at Dr. Kaczmar arose out of discovery abuses; the third issue arguably is directed at discovery abuses as well.  Nearly seventy-five percent of the pages of legal arguments in Pitney Bowes' brief for that motion were devoted to these three issues.  (Dkt. #424, Brief, at 13-36).  Again, in Judge Arterton's Summary Judgment/Daubert Ruling, these are the only aspects of the motion discussed.  629 F. Supp. 2d at 187-91.  Therefore, there will be no further reduction in Pitney Bowes' hours, other than for the unrelated entries.

### e.  APPLICATION FOR ATTORNEY'S FEES AND COSTS

Innis Arden does not dispute that "certain fees for preparation of [Pitney Bowes'] [f]ee [a]pplication are recoverable[,]" but requests that if the Court finds that "substantial reductions" in the fee application are "reasonable," then the time expended on the fee application be reduced by the same percentage as the overall application.  (Dkt. #568, Brief, at 34-35).   In addition, Innis Arden objects to twenty-five specific entries it claims are not

---

[33]Innis Arden is correct that Colbert's entry and one of DePanfilis' entries on June 29, 2009 concern attorney's fees, but such entries are compensable under Section I.B.4.e infra, so they are being left here.  Cf. notes 16-17 supra.

[34]As set forth in Section I.A.4 supra, Moon's rates throughout are $160/hour.  See note 26 supra.

related to this fee application.[35]

The Magistrate Judge finds that all the entries are directly related to preparation of the fee application, except for the entries of Zelesnick on July 21 and 23, 2009 for .6 hours and .7 hours, respectively.  Therefore, Zelesnick's entries are reduced by 1.3 hours.  There will be no further reductions.

C.  SUMMARY FOR PITNEY BOWES' ATTORNEYS

The reduction in hours for H&W personnel in Sections I.B.2 through I.B.4.e  supra, for the period  November 2008 through February 28, 2009 at the lower rates (including Attorney Steinberg, Ms. Moon and Ms. Donaire whose rates are unchanged), appear in Table 7 as follows:

---

[35]Pitney Bowes' ten-page reply brief does not address this issue. (Dkt. #569; but see note 14 supra).

**Table 7**

| Attorney ▶/ Section of Ruling ▼ | Stein-berg | Fewell | Riberio | Bilchik | Isani | Brickey | Moon | Donaire | Hernan-dez | Julin |
|---|---|---|---|---|---|---|---|---|---|---|
| I.B.2    (p. 20) | 0 | 1.7 | 0 | 0 | 0 | 0 | 7.5 | 0 | 0 | 0 |
| I.B.2    (p. 20) | 0 | 0 | 1.85 | 0 | 0 | 0 | 0.6 | 0 | 0 | 0 |
| I.B.2    (p. 21) | 0 | .75 | 0.45 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I.B.2    (p. 21) | 2.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| I.B.3 | 0 | 0 | 2.8 | 0 | 0 | 0 | .1 | 0 | 0 | 0 |
| I.B.4.a | 7.4 | 7.3 | 26.7 | 3.6 | 0 | 1.0 | 0 | 0 | 0 | 0 |
| I.B.4.b | 92.1 | 1.5 | 1.3 | 10.5 | 51.4 | 0 | 76.0 | 15.9 | 3.6 | 1.3 |
| I.B.4.c | 1.8 | 0 | 0.2 | 0 | 0.9 | 0 | 13.4 | 4.0 | 2.8 | 0 |
| I.B.4.d.i | 0 | 0 | 0 | 0 | 0 | 0 | 2.3 | 5.8 | 0 | 0 |
| I.B.4.d.ii | 0.7 | 0 | 0 | 0 | 0 | 0 | 0.7 | 9.6 | 0 | 0 |
| I.B.4.e | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.7 | 0 | 0 |
| TOTALS | 104.1 | 11.25 | 33.3 | 14.1 | 52.3 | 1.0 | 100.6 | 36.0 | 6.4 | 1.3 |

The reductions in hours for the H&W attorneys in Sections I.B.2 through I.B.4 supra

for the period March 1, 2009 to the present, whose rates have been increased, appear in

Table 8 as follows:

35

**Table 8**

| Attorney ▶/ Section of Ruling ▼ | Fewell | Riberio | Bilchik | Isani | Brickey |
|---|---|---|---|---|---|
| I.B.4.b | 0 | 61.0 | 77.0 | 63.4 | 0 |
| I.B.4.c | 0 | 0.6 | 0.6 | 0 | 0 |
| I.B.4.d.i | 0 | 0.15 | 1.9 | 0.4 | 0 |
| I.B.4.d.ii | 0 | 0.6 | 0 | 0.2 | 0 |
| TOTALS | 0 | 62.35 | 79.5 | 64.0 | 0 |

Therefore, the total attorneys' fees for H&W personnel, for the entire period, is as follows in Table 9:[36]

---

[36]The total hours/attorney in Tables 7 & 8 have been subtracted from the total hours/attorney in Table 3, either within the appropriate time period or combined (for Attorney Steinberg, Moon and Donaire).

**Table 9**

| Attorney | Hours | Hourly Fee | Subtotal |
|---|---|---|---|
| Marty Steinberg | 176.5 | $525 | $92,662.50 |
| Brent Fewell – 11/08 to 2/09 | 18.95 | $405 | $7,674.75 |
| Brent Fewell – 3/09 to present | 1.5 | $463 | $694.50 |
| Rafael Ribeiro – 11/08 to 2/09 | 15.8 | $215 | $3,397.00 |
| Rafael Ribeiro – 3/09 to present | 50.65 | $254 | $12,865.10 |
| Melissa Bilchik – 11/08 to 2/09 | 55.9 | $195 | $10,900.50 |
| Melissa Bilchik – 3/09 to present | 205.6 | $230 | $47,288.00 |
| Jamie Zysk Isani – 11/08 to 2/09 | 0.4 | $300 | $120.00 |
| Jamie Zysk Isani – 3/09 to present | 72.9 | $354 | $25,806.60 |
| Hillary Brickey – 11/08 to 2/09 | 0.0 | $195 | $0.00 |
| Hillary Brickey – 3/09 to present | 0.5 | $230 | $115.00 |
| Beth Moon | 296.9 | $160 | $47,504.00 |
| Gloria Donaire | 68.2 | $160 | $10,912.00 |
| Other Attorneys* | 3.2 | | $2,915.50 |
| TOTALS | 967.0 | | $262,855.45 |

    * = The hourly figure is derived by subtracting from 10.9 hours in Table 3 the 6.4 hours for Attorney Hernandez and the 1.3 hours for Attorney Julin.

    This monetary figure is derived by subtracting from $4,711.50 (in Table 3) $1,120 for Attorney Hernandez (6.4 hours x $175/hr.) and $676 for Attorney Julin (1.3 hours x $520/hour).  (Table 7; Dkt. #541, Exh. C).

The reductions in hours for DP personnel in Sections I.B.2 through I.B.4.e supra, for the period November 2008 through the present appear in Table 10 as follows:

**Table 10**

| Attorney ▶/ Section of Ruling ▼ | Colbert | DePanfilis | Shapiro | Zelesnick | Beverley |
|---|---|---|---|---|---|
| I.B.2 (p. 20) | 0.3 | 0.6 | 0 | 0 | 0 |
| I.B.2 (pp. 20-21) | 0.6 | 1.6 | 0 | 0.7 | 0 |
| I.B.2 (p. 21) | 0.7 | 0.7 | 0 | 0 | 0 |
| I.B.4.a | 5.8 | 3.1 | 12.1 | 0.8 | 0 |
| I.B.4.b | 5.3 | 27.8 | 0 | 0 | 13.5 |
| I.B.4.c. | 0 | 0.2 | 0 | 0.5 | 0 |
| I.B.4.d.i | 0 | 33.2 | 0 | 0 | 0 |
| I.B.4.d.ii | 0 | 0.2 | 0 | 0 | 0 |
| I.B.4.e. | 0 | 0 | 0 | 1.3 | 0 |
| TOTALS | 12.7 | 67.4 | 12.1 | 3.3 | 13.5 |

Therefore, the total attorney's fees for DP personnel is as follows in Table 11:[37]

**Table 11**

| Attorney | Hours | Hourly Rate | Subtotal |
|----------|-------|-------------|----------|
| Richard Colbert | 50.6 | $450 | $22,770.00 |
| Sarah DePanfilis | 295.2 | $315 | $92,988.00 |
| Jonathan Shapiro | 1.8 | $370 | $666.00 |
| Arlene Zelesnick | 111.2 | $160 | $17,792.00 |
| Tiffany Beverley | 9.2 | $160 | $1,472.00 |
| TOTALS | 468 | | $135,688.00 |

D. PITNEY BOWES' COSTS

Pitney Bowes seeks $13,999.40 in costs expended by H&W, and $22,716.24 expended

by DP, for a total of $36,715.64.   (Dkt. #541, Jt. Aff't, at 11, 13 & Exhs. M, R).  Innis Arden

objects to $5,930.83 in H&W's photocopying, litigation support and delivery services expenses

as lacking "back up documentation"; seeks a $3,130.06 reduction in Attorney Steinberg's travel

expenses (fifty percent) in that it cannot determine whether these travel expenses are allocable

entirely to discovery abuses or were for general litigation purposes only; objects to $1,808.44

in  travel expenses of Attorney Bilchik for the May 20, 2009 oral argument, since there were

already four other attorneys in attendance; objects to $5,282 in videotaping expenses for the

depositions of plaintiff's experts as "unnecessary"; seeks a $1,030.62 reduction for the

transcript fees for the May 26, 2009 status conference as "normal case management" and for

most of the May 20, 2009 status conference, which largely concerned spoliation (eighty

percent); and objects to DP's photocopying costs as lacking "back up information."  (Dkt.

---

[37]The total hours/attorney in Table 10 have been subtracted from the total hours/attorney
in Table 4.

#568, Brief, at 35; Dkt. #558, Exh. 23).   Innis Arden seeks a reduction of $20,631.95 to $16,083.69.  (Dkt. #568, Brief, at 35; Dkt. $558, Exh. 23).[38]

Of Innis Arden's six arguments, the only position that holds merit is the $3,130.06 reduction for one-half of Attorney Steinberg's travel expenses, as well as a fifty percent reduction of the $1,288.27 expenses for the May 20 and 26, 2009 status conferences before Judge Arterton (see Dkt. #421, Exh. R) or $644.14.  Therefore, Pitney Bowes' request for costs is reduced by $3,774.74 to $32,940.90 – $10,868.80 to H&W and $22,072.10 to DP.[39]

### E.  PITNEY BOWES' EXPERT FEES

Innis Arden does not object to the expenses incurred by Hubbard, in the amount of $2,509.31.   (Dkt. #568, Brief, at 26, n.41 & Exh. 6, at 2).   It does object, however, to Vaillancourt's invoices, in that they are "heavily redacted, and do not contain any information describing what . . . Vaillancourt did during the time claimed[,]" and as a result, seeks a twenty percent discount.  (Dkt. #568, Brief, at 26-27 (citing Dkt. #541, Exh. S), & Exh. 6, at 2).  Innis Arden also objects to Gravel's invoice, in that Gravel was retained by Pitney Bowes to opine on plaintiff's compliance with the NCP, and his time entries make no reference to having reviewed either Dr. Pignatello's or Dr. Kaczmar's expert reports.   (Dkt. #568, Brief, at 27 & Exh. 6, at 1-2).

Pitney Bowes has replied that detailed invoices from Vaillancourt are not necessary because it already has reduced Vaillancourt's fees by seventy-five percent "across the board . . . to account for the fact that only one of his four opinions was related to [Innis Arden's]

---

[38]Pitney Bowes did not address this issue in its ten-page reply brief.  (Dkt. #569; but see note 14 supra).

[39]If Innis Arden insists, the Magistrate Judge is willing to conduct an in camera review of the underlying documentation for photocopying, litigation support and delivery services.  See also note 40 infra.

discovery abuses." (Dkt. #569, at 8).[40]  Pitney Bowes further argues that Gravel's fees are also recoverable because the delayed production of invoices and cost letters directly affecting Gravel's work and preparation of an opinion relating to the NCP was specifically mentioned in the May 2009 Sanctions Ruling.  (Dkt. #569, at 9).

For the reasons stated by Pitney Bowes, no reduction is necessary from its expert fees, and Pitney Bowes is entitled to its full expert fees of $26,648.91.

F.  SUMMARY FOR ALL PITNEY BOWES' REQUESTS

Thus, Pitney Bowes is entitled to recover for the following items in Table 12 below:

**Table 12**

| Law Firm/Expert | Attorneys' Fees | Costs | Subtotal |
|---|---|---|---|
| Pullman & Comley (Table 6) | $31,562.50 | $0.00 | $31,562.50 |
| Hunton & Williams (Table 9) | $262,855.45 | $10,868.80 | $273,724.25 |
| Day Pitney (Table 11) | $135,688.00 | $22,072.10 | $157,760.10 |
| Expert Costs | $26,648.91 | $0.00 | $26,648.91 |
| TOTALS | $456,754.86 | $32,940.90 | $489,695.76 |

G.  PATELEY'S ATTORNEYS' FEES AND COSTS

Pateley seeks $35,971.00 in attorneys' fees and $2,570.50 in costs, for a total of $38,541.50.  (Dkt. #543, Kowalczyk Aff't at 3 & Exhs. A-B).  Innis Arden objects to Pateley's fee application "as a whole" in that May 2009 Sanctions Ruling granted Pitney Bowes' Motion

---

[40]Pitney Bowes has offered to provide unredacted copies to the Magistrate Judge for her in camera review.  (Dkt. #569, at 8, n. 10).  If Innis Arden insists, the Magistrate Judge is willing to conduct such review.  See note 39 supra.

for Sanctions and directed Pitney Bowes "alone" to file an application for fees and costs, without awarding fees and costs to Pateley. (Dkt. #568, Brief, at 35-36). Innis Arden also objects to thirty-six entries as outside the scope of the May 2009 Sanctions Ruling, including the Motion to Strike Supplemental Report of Dr. Kaczmar, the spoliation motion, the summary judgment motion, trial preparation, and other matters. (Dkt. #568, Brief, at 36; Dkt. #558, Exh. 13).

The motions list generated by CM/ECF is twenty-two pages long, with relatively few motions having been filed by Pateley, except for housekeeping motions like Motions for Extension of Time. As reflected in the vast disparity between the attorneys' fees and costs currently sought by Pitney Bowes and those sought by Pateley, Pitney Bowes bore the lion's share of the work load here in aggressively defending this lawsuit. When Pateley did file motions of substance, on most occasions, these more critical motions were filed jointly by Pitney Bowes and Pateley (when both were represented by PC)(see, e.g., Dkts. ##168, 169, 192, 203, 209), or Pitney Bowes filed a motion and brief, to which Pateley filed a tag-along "me too" motion (see, e.g., Dkt. 426; but see Dkt. #471). Most significantly, on March 16, 2009, Pateley filed a motion (Dkt. #426), in which it specifically "adopt[ed]" four of Pitney Bowes' motions – the spoliation motion, the two Daubert motions, and the sanctions motion. As such, Pateley is entitled to recover attorneys' fees and costs.

Pateley seeks the following hourly rates for its five attorneys and two paralegal assistants from MC: Francis J. Brady – $525; Mark R. Sussman – $450; Jennifer M. DelMonico — $350; Sarah P. Kowalczyk – $240; Lori S. Gardner – $215; Christine Moody and Robert Iaciofano – $180. (Kowalczyk Aff't at 3). Presumably, Innis Arden does not object to these hourly rates, as it pointed to MC as representing reasonable rates. (See Sections I.A.1-3 supra; Dkt. #558, Exh. 14). However, as indicated in Section I.A.4 supra, the hourly rates for

42

paralegal assistants is limited to $160.

Turning then to Innis Arden's specific objections, as indicated in Exhibit 13, there are eleven entries by Attorneys Kowalczyk, DelMonico and Brady, from January 14, 2009 through February 26, 2009, all of which relate to Pitney Bowes' Motion to Strike the Supplemental Report of Dr. Kaczmar.  (Dkt. #558, Exh. 13).  Pateley is not entitled to these attorneys' fees for two reasons – one, the motion was filed by Pitney Bowes, for which Pateley did not join in, and two, Pitney Bowes' request for this item was denied in Section I.B.4.a supra.  Therefore, Pateley is not entitled to 2.1 hours by Kowalcyzk, 1.3 hours by DelMonico, and 1.0 hours by Brady.

Innis Arden objects to another sixteen entries by Attorneys Brady, DelMonico, Kowalcyzk and Sussman, and Ms. Moody, from January 31, 2009 through May 22, 2009, relating to the spoliation and summary judgment motions.  Two of the entries – by Kowalczyk on April 13,2009 and by Moody on May 21, 2009 – are directly related to this sanctions motion, and thus are proper.  Seven of the entries are entirely related to the spoliation or summary judgment motions, and thus are not reimbursable here – by Brady on January 31, 2009 for 1.0 hours; by Kowalczyk on May 18, 2009 for .4 hours; by DelMonico on May 21, 2009 for .4 hours; by Kowalczyk on May 21, 2009 for 1.4 hours; by Brady on May 21, 2009 for 1.0 hours, and by Sussman on May 21 and 22, 2009 for .3 hours and .9 hours, respectively.

The remaining seven entries should be reduced, as the timekeeper considered the sanctions and/or Daubert motions in addition to the spoliation and/or summary judgment motions – DelMonico's entry on February 2, 2009 is reduced from .9 hours to .675 hours; Kowalcyzk's entries on March 16, 2009 and April 8, 2009 are reduced from 2.7 hours to 2.025 hours each; Brady's entry on March 16, 2009 is reduced from 1.3 hours to .975 hours; Kowalcyzk's entry on April 20, 2009 is reduced from 1.2 hours to .6 hours; Kowalczyk's entry

on May 20, 2009 is reduced from 8.5 hours to 4.25 hours; and DelMonico's entry on May 20,

2009 is reduced from .4 hours to .2 hours.

Innis Arden's two other objections have no merit.  See Section I.A.4.e supra.

Therefore, the reduction in hours for MC's attorneys is in Table 13 as follows:

**Table 13**

| Attorney ▶/ Prior Motions ▼ | Brady | Sussman | DelMonico | Kowalczyk |
|---|---|---|---|---|
| Kaczmar Supp. Report | 1.0 | 0 | 1.3 | 2.1 |
| Spoliation and/or SJ Motions | 2.0 | 1.2 | 0.4 | 1.8 |
| Partial Reduction for Spoliation and/or SJ Motions | .325 | 0 | .425 | 6.15 |
| TOTALS | 3.325 | 1.2 | 2.125 | 10.05 |

Therefore, Table 14 reflects the reductions in Pateley's request for attorney's fees.

**Table 14**

| Attorney | Reduction in Hours | Hourly Rate | Subtotal |
|---|---|---|---|
| Francis J. Brady | 3.325 | $525 | $1,745.63.00 |
| Mark R. Sussman | 1.2 | $450 | $540.00 |
| Jennifer M. DelMonico | 2.125 | $350 | $743.75 |
| Sarah P. Kowalczyk | 10.05 | $240 | $2,412.00 |
| TOTALS | 16.7 | | $5,441.38 |

Therefore, Pateley is awarded attorneys' fees in the amount of $30,529.62 ($35,971.00

minus $5,441.38) plus its modest costs of $2,570.50 (for the Pignatello and Kaczmar

deposition transcripts), for a total of $33,100.12.

44

H.  ENHANCEMENT

Given all that has transpired in this lawsuit, no further enhancement is necessary.[41]

## II. CONCLUSION

For the reasons stated above, defendant Pitney Bowes' Application for Attorneys' Fees and Costs (Dkt. #541) is granted in the amount of $456,754.86 in attorney's fees,  $26,648.91 in expert fees, and $32,940.90 in costs, for a total of $489,695.76, and defendant Pateley's Application for Attorneys' Fees and Costs (Dkt. #542) is granted in the amount of $30,529.62 in attorney's fees and $2,570.00 in costs, for a total of $33,100.12.

See 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen days after service of same);** FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary, H&HS, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**; Caidor v. Onondaga Country, 517 F.3d 601, 603-05 (2d Cir. 2008)**(failure to file timely objection to Magistrate Judge's discovery ruling will preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 21st  day of May, 2010.


   __/s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge

---

[41] If any counsel believes that one last settlement conference before this Magistrate Judge would be productive (see Dkts. ##323, 365,404, 405, 444, 436, 513), he or she should contact Chambers accordingly.